UNITED STATES, Appellee

v

JAMES L. BALLARD, Airman Second Class,
U. S. Air Force, Appellant

8 USCMA 561, 25 CMR 65

No. 9897

Decided January 3, 1958

*Captain John H. Leonard* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ellis L. Gottlieb.*

*Major Fred C. Vowell* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Robert W. Michels* and *Lieutenant Colonel Francis P. Murray.*

GEORGE W. LATIMER, Judge:

The accused stands convicted by a general court-martial of the offense of rape upon a female member of the United States Air Force, in violation of Article 120, Uniform Code of Military Justice, 10 USC § 920. He was sentenced to be discharged from the service with a bad-conduct discharge, to forfeit all pay and allowances, and to be confined at hard labor for one year. The convening authority approved the findings and sentence except to reduce the forfeitures to $35 per month for one year and to suspend the execution of the discharge portion of the sentence until the accused's release from confinement or the completion of appellate review, whichever event occurred later in time. The board of review affirmed. The accused petitioned this Court for review, and we granted his petition upon a single assignment of error arising out of the following circumstances. During the progress of the trial, the law officer advised several witnesses, sua sponte, of their rights against self-incrimination, and in some instances the privilege was exercised to the detriment of the accused. The issue for determination is whether these warnings, coupled with the law officer's rulings, deprived the accused of a fair trial.

In order to appreciate the part the law officer played in this drama, it is necessary to relate the facts and circumstances in some detail. The first instance of importance arose when he took it upon himself to insure that the victim was aware of her privilege while she was being subjected to cross-examination. During this interrogation, defense counsel inquired whether she had not during the year had intercourse with a certain Airman Jacobs, well knowing that he was married. Before the witness could reply, the law officer advised her that the question appeared to call for an answer which might be incriminating and that she, therefore, had the privilege to refuse to answer the question on the ground of self-incrimination. She thereupon asserted her privilege. Defense counsel then asked if she had engaged in an act of

sexual intercourse with the airman preceding the time she learned of his marriage status. Prior to the witness' response, the law officer repeated the warning and once again the victim took the cue and refused to answer. This moved defense counsel to inquire of the law officer:

"DC: Is it my understanding that every question I ask, she will be similarly instructed, if it is to the law officer's feeling or impression that it might be incriminating, or is it possible that one instruction would be sufficient."

To this inquiry, the law officer answered:

"LO: I hope it is your understanding that at any time it appears necessary to the law officer that this witness is not aware of her privilege, I shall so instruct her. The defense counsel may continue."

At a later point in his cross-examination of the prosecuting witness, defense counsel sought to have her answer whether she had indulged in a specified form of sodomy during the year. The witness stated that she refused to answer the question. Defense counsel inquired as to the ground of refusal, and the law officer supplied the answer by stating that it was obvious the answer would incriminate the witness; that she had a right to refuse to answer the question in accordance with his previous instructions to her; and that it was his understanding she was asserting her right against self-incrimination.

The last event in this series of warnings occurred when the victim was asked why she had delayed making a report of the offense to the law enforcement agency of the United States Air Force. When she replied that she was frightened and ashamed, defense counsel parried with a question as to whether her reason was because she was afraid she might subject Airman Jacobs to prosecution for having committed adultery with her. The law officer ruled the question was improper, stating that it concerned the same subject matter

as to which the witness had already asserted her privilege. Not being content to let the witness guide her own destinies after those warnings, the law officer went on to inform defense counsel that he was barred from asking further questions in that area. The net result of the law officer's method of operation was that the complaining witness was so protected that she escaped having to answer questions touching on other sex offenses which had for their purpose a showing of her alleged unchaste character.

We next consider the events which transpired while Airman Garcia, a Government witness, was on the witness stand. At the very outset, when asked by trial counsel to identify the accused, he requested that he be advised of his rights. The law officer denied the request and directed the witness to answer the question. Garcia identified the accused, and trial counsel then asked how long they had been acquainted. At this point, defense counsel importuned the law officer to advise the witness, but the latter stated he had nothing to say to the witness at that time. When the witness announced that he refused to testify to anything that might be held against him, the law officer insisted on an answer. When he asked if he knew the complaining witness, defense counsel again raised the advisability of the law officer warning the witness. The law officer then stated that if there was any privilege to be granted, that matter would rest between himself and the witness, at the proper time, and that he would appreciate no further interruptions. Garcia's ensuing testimony was such that it very definitely tended to incriminate him. But more to the point, it was particularly damaging to the accused and, while he cannot complain about the violation of a personal privilege running to Garcia, he is in a position to protest if the law officer followed a course which opened the gate for admission of the Government's evidence but closed it for entry of testimony favorable to him. Certainly, insofar as the Government's witnesses are concerned, that appears to have happened. In the case of the first witness, the warnings were given at such times as to keep out much evidence favorable to the accused. However, in the second instance, in spite of the plea to be informed, the law officer delayed the advice until substantial corroboration of certain aspects of the crime had been paraded before the court. Near the end of this witness' testimony and while being examined by a court member, the law officer finally informed him of his right not to answer a question. By that time, the noose was tightened around the neck of the accused and the warning was of questionable value to the witness.

That brings us to the witnesses called by the defense. Of the three called, two were friendly witnesses while the third was hostile. After preliminary questions of identification, the law officer took occasion to interrupt the direct examination of these witnesses, and these episodes may be capsulized to some degree without distorting their significance to the issue at hand. Each of the three had been called for the purpose of testifying to his illicit relations with the prosecuting witness prior to the time she claimed to have been raped by the accused. Contrary to Garcia's experience, each had the benefit of an early warning, for it came at the commencement of the testimony.

As to Airman Jacobs—and his testimony ought to have been most beneficial to the accused—the law officer ascertained from the witness that defense counsel had already explained to him his privilege against self-incrimination before calling him to the stand. Nevertheless, the law officer, in keeping with his belief that the warning was a personal matter between the witness and himself, made this statement:

"Q. I want to point out to you that this series of questions are getting to the point that they appear to the law officer to call for an answer which may tend to incriminate you. Therefore, you have the privilege of refusing to answer the questions on the ground of self-incrimination; however, unless you now assert that privilege, you will be required to answer questions and you will be examined

564

fully as to all matters brought out. Knowing this, do you desire to assert the privilege of self-incrimination.

A. Yes, sir.

Q. Do you fully understand the meaning and effect of what I have told you?

A. (The witness did not answer.)

Q. Do I understand you Airman Jacobs, that you wish to exercise that right?

A. Yes, sir."

This witness apparently had intimate relations with the prosecutrix, he was very friendly with her, and no doubt desired to protect her. In the light of that and the warning given by the law officer, it would be miraculous indeed to find the witness failing to take advantage of the kindly advice furnished unto him.

In the case of the witness Williamson, the warning was given after the following exchange of comments:

[DC.] "Now, the next question I am going to ask you, you may refuse to answer on the ground that it might incriminate you. I am going to ask if you had sexual intercourse." [Assumedly, with the complaining witness.]

Trial counsel objected to defense counsel warning his own witness in court, believing that to be the duty of the court. The law officer agreed, stating:

"I will ask the defense counsel, in the future, as we have in the past, to refrain from attempting to exercise the privilege which is plainly a matter between a witness and the court. If I feel that an answer would incriminate a witness, I shall so inform him. I choose to do that at this time."

The witness went on to answer but, for reasons which will be related hereinafter, his credibility was largely impaired. The third witness was also warned, but he, too, answered and his warning raises no particular problem except as is indicated in the above quotation. From the language therein used, it appears that the law officer concluded the field of warning was within his sole domain and that he alone was burdened with the duty to advise the witnesses on their rights and privileges.

Appellate defense counsel point out that in all instances save one the law officer interceded and gave the self-incrimination instruction at times when questions were asked which, had they been answered, would have shown the bad character, abnormal sexual behavior, or promiscuity of the prosecuting witness. The claim is made that this fact is significant of the law officer's aid to the prosecution. We, of course, have no reason to believe that he knowingly intended to favor the Government, but the effect of his rulings brought about that result. In this type of case, it is proper to prove the unchaste character of the complaining witness, and it oft becomes critical to an accused if he is precluded from exposing her lewd repute, habits, ways of life, associates, and her specific acts of illicit intercourse and others of a lascivious nature. The means of producing that kind of evidence are limited and it is quite obvious that if a law officer becomes active in advising witnesses that they need not answer, he closes up the few avenues of relevant testimony open to an accused. Therefore, considerable tact and judgment must be exercised in warning witnesses for the truth should not be sacrificed by oversolicitous law officers.

The Manual for Courts-Martial, United States, 1951, at paragraph 150b, states what we belive to be the rule adopted in most American jurisdictions. It states:

". . . the court should advise an apparently uninformed witness of his right to decline to make any answer which might tend to incriminate him."

Cf. Wigmore, Evidence, 3d ed, § 2269. See also United States v Block, 88 F 2d 618 (CA 2d Cir) (1937), certiorari denied, 301 US 690, 81 L ed 1347, 57 S Ct 793.

That statement goes no further than to follow the current tenor of civilian judicial opinion to the effect that it is

within the discretion of the trial judge to alert unadvised witnesses to their privilege against self-incrimination when an incriminating fact is inquired about at trial. Wharton, Criminal Evidence, 12th ed, § 722. The purpose of the rule is to perfect the rights of the witness, but there is a countervailing policy of not suppressing the truth and a law officer should not be obsessed with the idea that the former must prevail at all costs. Wigmore, op cit supra, sums the matter up as follows:

"In the United States both the rule and the trial custom vary in the different jurisdictions. No doubt a capable and painstaking judge will give the warning, where need appears; but there is no reason for letting a wholesome custom degenerate into a technical rule."

As in the civilian sphere, we find good reason to leave the matter largely to the discretion of presiding officers of courts-martial. United States v Howard, 5 USCMA 186, 17 CMR 186. But hypersensitivity to the possibility that a witness is not aware of his privilege against self-incrimination should not result in a law officer monitoring each question and by repeated warnings shutting off the search for the truth. Obviously, if he errs and orders the witness to supply relevant ▮▮▮▮▮ ▮ evidence, albeit incriminating, the accused cannot complain, for he is not the beneficiary of the privilege and the evidence produced against him has some probative value. In that instance the error legally prejudices the witness not the opposing party. But if the law officer favors the witness and keeps evidence out of the record, the accused is denied the benefit of testimony which might assist the court-martial in ascertaining the truth. For that reason, a law officer should not interpose repeated warnings unless the witness gives clear indications that he does not understand the advice previously given. It is fairly obvious that implicit in a warning is a suggestion not to answer and to reiterate a prompting once given is to destroy the balance between the protection of the witness on the one hand and the necessity of getting at the truth on the other.

Having made some general observations, we must scan the record to see if the conduct on the part of ▮▮▮▮▮ ▮ the law officer in apprising witnesses of their right not to incriminate themselves transcended the bounds of reasonable discretion. The examination of Airman Garcia presents an instance which points in that direction. The witness and defense counsel early in the direct examination by trial counsel both requested that the law officer explain the privilege. Perhaps no possibility of incrimination existed in answering the particular question of trial counsel at the time the requests were made, but it was apparent that the witness was being led to an area where if he answered he would incriminate himself. Apparently, by his directions to the witness to answer and his reply to defense counsel, the law officer left the impression that he would signal the witness whenever the privilege could be exercised. The warning, however, was not given until all the damaging evidence against the accused had been placed in the record. Because of his early request to be advised, it is a fair assumption that this witness would have taken refuge behind his privilege had he been given the solicitous treatment afforded others called to the witness stand. In fairness to the law officer, we should say that the record indicates he did not believe the testimony of the witness was incriminating until the warning was given. However, we are sure that Garcia's prior testimony, of participating with the accused in driving the victim to a deserted area, of then leaving the car with the accused and agreeing to wait, even if he heard noise and "hollering," while the accused returned to the car to accomplish his announced desires upon the victim, and finally his testimony of having had intercourse with the prosecutrix immediately following the accused, spins a web of circumstances which raises a serious question of his own criminality in the adventure.

We believe the meticulous concern of the law officer to preclude the prosecu-

trix from waiving her privilege also tends to establish that he moved beyond the bounds of wise discretion. While she was being cross-examined, he reminded the witness of her rights immediately following a question concerning her sexual intercourse with Airman Jacobs after she learned he was married. He refreshed her memory when she was asked about her relations before she discovered he was not an unmarried man. On two or three other occasions he advised her of her rights and he sustained some objections by trial counsel which in effect were based on a violation of her privilege. To warn and rewarn could only have been to induce her to exercise the privilege. After the first warning, she could not have been uninformed and it appears to us that he acted unwisely in suggesting to her time and again that an answer was not required and that he would warn her any time it appeared to him she was not aware of her privilege. In the interest of affording the accused a fair trial, the witness should have been left free to answer or not after being once adequately informed. The issue of consent was reasonably raised and the repeated warnings to the witness needlessly obstructed defense counsel in his efforts to search out and arrive at the truth. It assuredly was not in the interest of justice for the law officer to be on the watch for opportunities to drum the privilege into a witness' head until such time as he concluded she had learned the lesson well.

With regard to the three defense witnesses, it seems axiomatic that the law officer was more concerned about the privileges of the witness than he was of the rights of the accused when he warned Airman Jacobs after receiving the assurance of that witness that defense counsel had already fully explained his privilege not to answer questions on the ground of self-incrimination. Jacobs was certainly not uninformed and yet in this instance the law officer did not wait until an incriminating question was propounded. He alerted the witness by telling him the questions were leading to an incriminating area and that the witness need not answer the questions. That in effect was an invitation to remain silent, and it is not surprising the witness accepted the advice as it opened an avenue of escape from the trying ordeal. He later became a witness for the Government and was used as a character witness for the prosecutrix. In addition, he testified that the defense witness Williamson was unworthy of belief. Therefore, his testimony concerning any illicit relations with the prosecutrix—assuming his answers would have been favorable to the accused and we must make that assumption for he was a defense witness—would have been most beneficial. Had he admitted sexual relations with the prosecutrix, the Government's case on lack of consent would have been weakened.

While we have no disposition to discourage law officers from protecting uninformed witnesses of their privilege to refuse to answer incriminating questions, we believe the foregoing discussion points up the fact that the law officer, in effect, exercised the privilege for the witness. He thus unnecessarily interfered with the production of relevant evidence and turned an option into a prohibition. This was erroneous and prejudicial to the accused.

Counsel for the Government argue fervently that the law officer did not err, but they go on to contend that, even if he did, there was no prejudice to the accused. This argument is predicated upon the hypothesis that the evidence barred by the claim of privilege was ultimately placed before the court. The difficulty with the argument is threefold. The complaining witness escaped having to make damaging admissions against herself. Patently that would be the best evidence to weaken her claim of lack of consent. Second, much of the evidence was furnished by a witness whose credibility was attacked and partially undermined by prosecution witnesses. Last, Jacobs escaped testifying to his relations with the victim and, in view of his favorable attitude toward her, a very effective source of testimony was dried up by his claim of privilege.

**567**

Therefore, we conclude there was substantial prejudice to the accused.

Accordingly, the decision of the board of review is reversed. A rehearing may be ordered.

Judge FERGUSON concurs.

Chief Judge QUINN concurs in the result.