UNITED STATES, Appellee

v

CHARLES D. CHADD, Master Sergeant,
U. S. Army, Appellant

13 USCMA 438, 32 CMR 438

No. 16,121

January 25, 1963

*Captain George C. Ryker* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod* and *Captain David M. Gill.*

*Captain Jerome Nelson* argued the cause for Appellee, United States. With him on the brief was *Major Francis M. Cooper.*

## Opinion of the Court

FERGUSON, Judge:

Accused was tried by general court-martial and found guilty of rape, in violation of Uniform Code of Military Justice, Article 120, 10 USC § 920, and not guilty of desertion, in violation of Code, supra, Article 85, 10 USC § 885, but guilty of the lesser included offense of absence without leave, in violation of Code, supra, Article 86, 10 USC § 886. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for five years, and reduction to the grade of Private (E-1). The convening authority reduced that portion of the sentence relating to confinement to three years, but otherwise approved the sentence. The board of review affirmed and also denied accused's petition for new trial.[1] We granted review limited to the issue whether it abused its discretion in refusing to direct the new trial. United States v Thomas, 3 USCMA 161, 11 CMR 161.

The record reflects that the alleged victim, hereinafter referred to as A, then a Women's Army Corps private, visited the Noncommissioned Officers' Club at Fort Monmouth, New Jersey. She had been married five weeks previously to another soldier stationed at Fort McClellan, Alabama. Her transfer to Fort Monmouth had been effected two weeks previously.

While A was sitting in the Club, with WAC companions, she was approached by the accused, who invited her to join him at the bar. According to A, she initially demurred, but eventually agreed to go with accused at the urging of her companions.

At the bar, she engaged in an "intelligent conversation" with accused and other noncommissioned officers, but only drank a cup of coffee. Finally, she told Chadd that she must rejoin her friends, and the two left the bar. They discovered the other women had departed.

Accused suggested a drive through the surrounding countryside. She agreed and was seen leaving Fort Monmouth in accused's car. What ultimately happened in the next eight or ten hours varies sharply, depending on whether one accepts A's version or that of Sergeant Chadd.

---

[1] On July 13, 1962, the Secretary of the Army directed accused's restoration to duty under a suspended sentence upon completion of a military retraining program.

According to A, the accused drove her through the Atlantic Highlands section of New Jersey. They stopped briefly for refreshments and continued to tour the countryside. Finally, accused came to a stop in a lonely area. There, he became "very fresh" and attempted to fondle her indecently and to assault her. In the course of the attack, accused struck her repeatedly while she resisted, "bit him fairly hard" on the face, screamed, and sounded the automobile horn. He ceased his attentions and apologized.

The car was started, and A believed they were returning to Fort Monmouth. Instead, after driving some distance, accused returned once more to the place at which they had earlier parked. Again, he attempted to fondle A, assaulted her indecently, and sought a sexual relationship with her. Once more, she resisted, screamed, and violently rejected his attentions. He struck her repeatedly, but finally abandoned the attack.

Accused again began to drive, and A began to talk to him in an attempt to persuade him to return to Fort Monmouth. En route, she made no attempt to escape or to secure aid, even though the car passed a policeman to whom her injuries and disheveled condition should have been apparent.

Accused, however, brought the car to a halt for a third time and renewed his assault upon her virtue. On this occasion, despite her resistance, he was successful in removing some of her clothing and in effecting penetration. After the act was completed, she dressed herself, and the parties finally set out for their station. En route, accused stopped and entered a store to purchase some chewing gum. The prosecutrix made no effort to leave the vehicle or to secure aid. When the trip was resumed, she agreed to see the accused the next day. Upon arrival at Fort Monmouth, he dropped her off at the rear of the WAC barracks.

Accused's testimony generally agrees with that of the prosecutrix concerning their overall peregrinations. He vehemently denied any nonconsensual sex-

ual acts, and asserted that A had engaged in provocative behavior from the commencement of their ill-fated drive. The parties "necked" on and off during the trip, and ended up parked in a short lane. There, intimate caresses were exchanged, and she suggested that they repair to a motel. He pointed out that he did not have the money to rent a room and that such would cause her to miss bedcheck. The act of intercourse was accordingly consummated in his automobile.

The couple returned to Fort Monmouth at approximately 11:00 p.m. After entering the WAC barracks, A complained to the Charge of Quarters, Private First Class Erickson, that she "had been attacked." According to Erickson, the victim was "in a state of half shock and her mouth was bleeding. Her clothes were pretty messed up. Her face was bruised . . . [there being] an extreme redness on the right cheek and where it had started to turn a bluish purple, black and blue." Private A also had a "bruised eye" and finger marks across her cheeks. The Duty Noncommissioned Officer, Sergeant Bermingham, and the WAC Detachment Duty Officer, Lieutenant B, corroborated to some extent the testimony of the Charge of Quarters.

Private C also testified concerning A's condition. In addition to reiterating the matters set out above, she noted the victim's eye was "discolored, a dark color, red and definitely discolored or purplish, you might say." It was not "exactly" black. She assisted the Charge of Quarters in treating A for shock and accompanied her to the hospital.

Dr. William Peard examined A on the night of her admission to Patterson Army Hospital, Fort Monmouth. He found a small bruise on the back of her head, a small cut on her lower lip, noticeably reddened cheeks, and superficial abrasions or red marks on her thighs. A vaginal smear was taken, and the presence of semen detected. Admission to the hospital was based upon the victim's emotional disturbance. Her condition was "suggestive of more

violence than is usually associated with a simple act [of intercourse]."

Based upon the victim's complaint, the accused was apprehended in his quarters during the early morning hours of April 9. A criminal investigator advised him of his rights under Code, supra, Article 31, 10 USC § 831, and that he was suspected of assaulting Private A. He denied his guilt and seemed puzzled by the accusation. There were no apparent bite marks or scratches on his face or hands. The investigator later visited A and did not note any blackened eye.

Sergeant Chadd was released to his organization. He returned to his quarters. The more he thought, "the more confused he became." He then absented himself without leave. He was apprehended by agents of the Federal Bureau of Investigation on August 3, 1961.

After the conclusion of the trial, defense counsel, who had previously conducted a full and fruitless investigation into the background of the prosecutrix, found out that criminal investigators had commenced an inquiry into allegations of homosexual conduct on her part. At his request, the convening authority delayed action on accused's case until the matter had been examined. After reviewing the evidence thus uncovered and considering the advice of his staff judge advocate, he concluded a rehearing was not warranted by the new matter.

Information gathered in this posttrial investigation forms the basis for the petition for new trial addressed to The Judge Advocate General and referred by him to the board of review. In substance, it discloses the following matters:

a. The alleged victim, A, is alleged to have engaged in several homosexual acts with S, a now discharged member of the Women's Army Corps, who was separated for her admitted homosexuality.

b. In addition, there are strong intimations of a similar relationship between the prosecutrix and a Private Y.

c. It also is alleged that Private C, who testified regarding the victim's condition and her fresh complaint, is a practicing homosexual.

d. In addition, it is averred, without elaboration, that Lieutenant B, at the time of the trial undergoing administrative action to separate her from the service, "was suspected of being a ringleader in the WAC homosexual group."

e. A denies such misconduct.

f. Finally, it appears that the entire investigation grew out of a jealous assault upon the prosecutrix by former Private S on November 25, 1961, one month after accused's trial was concluded.

A petition for a new trial is an extraordinary remedy which Congress has provided in addition to normal appellate channels. Generally speaking, it is designed to reach extra-record matters which affect an accused's guilt and thereby to prevent injustice. Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 1210, 1211. The pertinent statute—Code, supra, Article 73, 10 USC § 873—provides as follows:

"At any time within one year after approval by the convening authority of a court-martial sentence which extends to death, dismissal, dishonorable or bad-conduct discharge, or confinement for one year or more, the accused may petition the Judge Advocate General for a new trial on the ground of newly discovered evidence or fraud on the court. If the accused's case is pending before the board of review or before the Court of Military Appeals, the Judge Advocate General shall refer the petition to the board or court, as the case may be, for action. Otherwise the Judge Advocate General shall act upon the petition."

We have had occasion in the past to inquire extensively into the background of Code, supra, Article 73, and to set down the requirements which its legislative history indicates that Congress intended

**441**

to be met before the petition may be granted. In this respect, it is clear that it was meant to afford this remedy to an accused under the same conditions applied by the ordinary United States courts. These are:

a. The record of trial, petition, and other matters presented by the accused indicate an injustice may have resulted.

b. The evidence in fact is newly discovered.

c. Due diligence to discover it was exercised at the time of trial.

d. The newly discovered evidence will probably cause a different result when presented to another court-martial.

See House Hearings, supra, page 1212; Rule 33, Federal Rules of Criminal Procedure and Annotation thereto; Manual for Courts-Martial, United States, 1951, paragraph 109; and United States v Childs, 5 USCMA 270, 17 CMR 270.

The Government contends that the board acted correctly in denying the petition, as the evidence pertaining to A's and C's homosexual acts, if true, is irrelevant and inadmissible, and, in any event, a new trial would merely result in another conviction. Basically, its argument regarding A's alleged misconduct is premised on the theory that a female homosexual is unlikely to engage consensually in heterosexual intercourse. We believe this position overlooks several important factors.

First, concerning the charges of homosexuality which have been made against the prosecutrix, the ▆ law is quite clear that such evidence is relevant and admissible not only with regard to her credibility but also on the issue whether she consented to the act of intercourse with Sergeant Chadd. Thus, the Manual, supra, states, at page 291:

". . . . However, in a prosecution for rape, or for any other sexual offense in which lack of consent is an element, any evidence, otherwise competent, tending to show the unchaste character of the alleged victim *is ad-*

*missible on the issue of the probability of her having consented to the act charged . . . and on the question of her credibility, without proof of conviction of any crime involved. For this purpose, evidence of her lewd repute, habits, ways of life, or associations, and of her specific acts of illicit sexual intercourse or other lascivious acts with the accused or others, is material."* [Emphasis supplied.]

And in United States v Ballard, 8 USCMA 561, 25 CMR 65, this Court likewise pointed out that, in a prosecution for rape, "it is proper to prove the unchaste character of the complaining witness, and it oft becomes critical to an accused if he is precluded from exposing her lewd repute, habits, ways of life, associates, and her specific acts of illicit intercourse and others of a lascivious nature." *Ballard,* supra, at page 565.

Assuming, therefore, the truth of the charges laid against A, it is clear that such evidence is relevant and material to the issue whether she consented to intercourse with Chadd. That such conduct is lewd and lascivious is not arguable, and we believe wholly unjustified the conclusion by the Government that behavior of this nature precludes normal heterosexual contacts. Indeed, we note in this record that A was a recently married woman and testified that she had previously engaged in sexual relations with her husband. Moreover, while we do not pretend to psychiatric expertise, we call counsel's attention to the fact that many persons so afflicted are bisexual in their practices. See, generally, Neustatter, Psychological Disorder and Crime, pages 146, 149 (1953); Herzog, Medical Jurisprudence, §§ 785, 790 (1931). In any event, we leave this matter for argument at another level, and conclude that it is not of sufficient import to affect the result which we hereinafter reach.

Regarding C's alleged misconduct and the insinuations as to Lieutenant B, we reach no conclusion from the state of the evidence presented. On the one hand, there is much to be said for the argument of the United States that

such evidence alone is irrelevant in the case of the ordinary witness. Cf. United States v Grady, 13 USCMA 242, 32 CMR 242. On the other hand, there is more than a glimmering of proof in the affidavits filed in support of the petition that, as appellate defense counsel argue, there was in existence in the prosecutrix' unit a "close-knit group of 'gay' girls" to which she, C, and perhaps Lieutenant B belonged. Thus, at a new trial, a relationship might be developed which would remove all doubt concerning this subsidiary issue. United States v Grady, supra; United States v Marcey, 9 USCMA 182, 25 CMR 444. On the present state of the petition, we decline to speculate on the question. Indeed, we need not do so in view of the evidence regarding A.

Having disposed of these preliminary matters, we turn to the standards which we set out in United States ▆▆▆▆▆▆▆ ▆ v Childs, supra. There is no doubt that each test thus laid down has been fully satisfied by the accused and that he was entitled to the extraordinary relief which he requested from the board of review.

First, it is clear from the record of trial that an injustice may have resulted from accused's conviction of rape. While the evidence may meet the test of legal sufficiency, it is far from compelling. Indeed, the prosecutrix' testimony is replete with matters which might bring puzzlement to the mind of the most astute fact finder. Thus, she admitted that, although married for just five weeks, she accepted accused's invitation to go for a drive; that after he had twice attempted to rape her, she nevertheless made no attempt to leave the vehicle; that she made no complaint to an apparently available policeman after the second assault; and that she made no attempt to forego the accused's company after consummation of the offense, even though he left her alone in his car. True it is that she explained these matters, but we cannot say that any of these expatiations on her thought processes are so credible that the court members would have accepted them even though her alleged background had been disclosed.

Moreover, while her testimony was corroborated by evidence of fresh complaint, again there are substantial variances between the testimony of the several witnesses thereto concerning the extent of her apparent injuries and that of the examining physician and the criminal investigator. It is also to be remembered that one and possibly two of these prosecution witnesses is stated to have been involved in the same group of homosexuals to which this prosecutrix is said to belong.

The record also indicates accused's consistent and unimpeached denial of his guilt, together with an explanation of his flight, sufficiently reasonable at least to persuade the court to acquit him of desertion. Moreover, it is uncontradicted that his face bore no indication of the prosecutrix' alleged bite. Thus, we cannot say that the evidence of his guilt is of such quality and quantity that the verdict of the court was inevitable, particularly when, as has been noted by the Chief Judge in a similar context, there are so many disturbing aspects to the case. United States v Bourchier, 5 USCMA 15, 28, 17 CMR 15, 28. We conclude, therefore, in light of the petition, there is a likelihood that accused's conviction was unjust.

The petition shows that the evidence is both newly discovered and that counsel exercised due diligence prior to the trial. The Government does not contend otherwise, and there are affidavits from trial defense counsel and a senior criminal investigator which fully support that conclusion. We turn, therefore, to the question whether the newly discovered evidence, if presented to another court-martial, would probably produce a result more favorable to the accused.

Once more, the appropriate standard has been met. Much of the discussion of the evidence above is equally applicable here. It is apparent from the record that the only real issue presented to the court involved whether A consented to the act of intercourse. On the one hand is arrayed her testimony concerning her actions, marred by cross-examination but supported as it is by evidence

**443**

of fresh complaint, minor injuries, and the accused's flight. On the other hand, is the accused's denial of guilt, his explanation of his unauthorized absence, the absence of any injuries to his person, and the conceded fact that A had several opportunities to leave the accused but availed herself of none. A's explanations of her actions are far from convincing in many respects, and we dare say that another court-martial would view with extreme interest evidence regarding her supposed degrading and disgustingly indecent behavior, since, at this trial, she was represented by the Government, albeit innocently, as a "young, lonesome girl [of impeccably "good moral character"] who misplaced her trust in a Master Sergeant." Cf. United States v Beatty, 10 USCMA 311, 27 CMR 385. At least, taking the case as a whole, we are so far convinced of the importance of this new matter that we believe an opportunity should be afforded the accused to have it weighed in balance.

We accordingly conclude that the board of review abused its discretion in denying accused's petition for new trial. In reaching this conclusion, we hasten to add that we express no view concerning the validity of the allegations concerning A, C, or Lieutenant B, nor do we mean to intimate that the present evidence regarding the charge of rape does not support the properly instructed findings of the court-martial. All we do say is that, considered in the context of the record here presented, the newly discovered evidence will probably cause another court-martial to reach a different result. We accord the accused the opportunity to seek that exoneration, for he has satisfied every condition which has been laid down for the granting of such extraordinary relief. In short, it is only with full knowledge of all the facts that justice may be done, for, while " 'It is true that rape is a most detestable crime . . . it must [also] be remembered that it is an accusation easy to be made, hard to be proved, but harder to be defended [against] by the party accused, though innocent.' " Manual, supra, page 355.

The decision of the board of review is reversed, and the petition for new trial is granted. The findings of guilty of Charge II and its specification and the sentence are set aside, and the record of trial is returned to The Judge Advocate General of the Army.

Chief Judge QUINN and Judge KILDAY concur.