UNITED STATES, Appellee

v

HAROLD FARRINGTON, Private First Class (alias
HAROLD BRYANT), U. S. Army, Appellant

14 USCMA 614, 34 CMR 394

No. 17,526

June 19, 1964

Captain Clifford B. Hearn, Jr., argued the cause for Appellant, Accused. With him on the brief were Colonel Joseph L. Chalk and Captain Daniel H. Benson.

Captain Barrie G. Sullivan, II, argued the cause for Appellee, United States. With him on the brief was Lieutenant Colonel Francis M. Cooper.

KILDAY, Judge:

Appellant was tried by general court-martial, convened at Frankfurt/Main, Germany, charged with intentionally inflicting grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. He pleaded not guilty but was found guilty as charged. The court-martial sentenced him to a dishonorable discharge, total forfeitures, reduction to the lowest enlisted grade, and confinement at hard labor for a period of three years.

The convening authority approved the sentence and a board of review in the office of The Judge Advocate General of the Army affirmed the findings and sentence.

This Court granted review on an assignment in which appellate defense counsel assert that:

> The law officer's instruction to the court concerning a question posed by a court member as to whether something should be said regarding the appellant's failure to testify was inadequate to cure the prejudice to the appellant.

On the night of the difficulty here involved, Private First Class Herman Beck left a bar in Hanau, Germany, in company with a Private First Class Wilkins and another soldier whose name Beck stated, at the time of trial, he was unable to recall. All three had been drinking and Beck testified he was bringing Wilkins in to the billets as he was a little bit intoxicated. Beck admitted he was also intoxicated, but not to the extent that he did not realize what was going on around him that night.

As the three were crossing the railroad tracks about a hundred yards from the bar from which they had come, another individual approached them from the opposite direction. There being insufficient room for the four to pass, Beck told the individual approaching to get out of his way, and move over. Beck testified that as they passed the other individual made body contact with an elbow bump and uttered an obscene remark. Thereupon Beck turned around and went back to ask the individual what he was "beefing" about, and further obscenity ensued. The other individual "went into a — — —, some kind of a crouch, a ready and — — —, a squat and ready position." Beck put up his fists in a fighting position. The other individual jumped into Beck and hit him in the stomach and jumped back again. Beck discovered he had been stabbed in the stomach. The individual turned and began walking away at a rapid pace in the direction of the before-mentioned bar. Beck threw some rocks at the retreating individual, who started to run, and Beck ran after him. Seeing some acquaintances from his regiment at the bar, Beck called to them to catch the other person as he had stabbed him or cut him. Beck went into shock and was taken to the hospital for treatment of a grievous stab wound of the stomach.

At the trial Beck stated that the man who struck him and stabbed him was built about like the appellant and was of about the same complexion, but he refused to positively identify him. Beck admitted he did so identify the appellant previously; that he had picked appellant out of a lineup and had made two written statements, under oath, in which he had identified appellant as the person who had stabbed him. He explained the matter by stating that on the night in question he was slightly intoxicated, and there might be a chance that he may not be the man; he identified appellant as being the man and in his eyes, at the time, he was the man. But the more he looked at him he just did not appear to be the man.

Private First Class George Woods testified he knew the accused and Beck. He was standing outside the above-mentioned bar on the night in question, when he saw two men running toward him. There was sufficient light for him to see and recognize persons. This witness stated he heard Beck, whom he recognized at that time, call

**615**

out to stop that man, that he had stabbed him. He saw appellant as he passed by, and he was sure it was appellant. He had known appellant before and had drunk beer with him, and there was no question in his mind but that it was appellant who ran by him. Another witness testified to having seen appellant in the base beer hall about the time involved, and said appellant told him he had a run-in with some fellows on the street, growing out of a bumping into them in going around them.

At his trial, appellant relied upon the defense of alibi. In accordance with the specific request of defense counsel, the law officer did not instruct upon the issue of self-defense but did correctly instruct upon the issue of alibi, observing that self-defense and alibi would be so inconsistent as to be of prejudice to appellant. Defense counsel concurred and limited his defense to alibi, and all evidence offered by appellant had reference to that issue.

The evidence on this issue consisted of the testimony of several soldiers of appellant's organization that at some time around ten thirty on the night in question, appellant came into a room of the billets where they were playing cards. Shortly after his arrival some four soldiers came to the door of the room. One of them entered and questioned several of the occupants as to whether they had been out that night. When this soldier came to appellant some one stated "that's him" and some one asked appellant "did you cut my partner, and Farrington said, no; and he said, yeh, you cut him; and then he started swinging at Farrington." It also appears that others of the four who had come to the room joined in the assault on appellant. Appellant freed himself from his assailants and ran from the room. As observed by the staff judge advocate in his post-trial review, the victim, Beck, did not exactly fix the time element of the assault on him, nor did the other witnesses exactly fix the time of the assault upon appellant in the room in the billets. And the time estimate given by witnesses as to the two transactions would

have permitted accused to have been present at both places. Thus, the finders of fact were free to resolve the time element.

The appellant did not testify at his trial.

After both sides had rested prior to findings, and had completed their arguments, the law officer instructed the court-martial. At the conclusion of his advice, the law officer inquired whether either side desired further instructions, and both trial counsel and defense counsel indicated their satisfaction with those given. Thereupon a court member indicated he had a question and stated:

"Yes, I do, actually, and this just may be a recollection of old days, but is there any remark required with reference to or relevant to the accused taking the stand or not taking the stand?"

The law officer responded immediately and spontaneously:

"The accused is not obligated to take the stand and no remark will be made concerning it, and I will instruct the court not to consider the remark of the court member. The accused, of course I would say, is represented by competent counsel. That's all I can say."

This colloquy gives rise to the granted issue.

Appellant contends the very fact that the question was asked in open court put the other court members on notice of the failure of the appellant to testify. Assuming, *arguendo*, that the court member's purpose was paternalistic, it is asserted it is entirely logical that at least one court member would take the failure of the appellant to testify as some sort of admission of guilt. Further, it is urged that the unfavorable inferences laymen draw from the failure of an accused to testify are well known; that visions of communists, members of the mafia, and other undesirables, are imprinted on such laymen's minds. Appellate defense counsel argue that the court member's question could have triggered such thoughts, and the law officer's instruc-

tion failed to cleanse the court members' minds of the polluted matter. Finally, it is contended, while the law officer told the court an accused is not obligated to testify, he failed to instruct them not to draw any inferences or presumptions from his failure to testify. Wherefore, it is urged the conviction should be reversed. As supporting that position, appellant cites United States v Seay, 13 USCMA 540, 33 CMR 72; and United States v Allinder, 9 USCMA 575, 26 CMR 355.

We observe that neither trial counsel nor the law officer was involved in bringing before the court-martial the fact that appellant had not testified. Cf. Wilson v United States, 149 US 60, 37 L ed 650, 13 S Ct 765 (1893). Neither do we perceive any effective manner in which either of them could have completely prevented a court-martial member from having asked the question. We quote the language of Judge Augustus N. Hand in United States v Di Carlo, 64 F2d 15, 18 (CA2d Cir) (1933):

. . . We should be blind to realities if we supposed that juries are unconscious of the omission of a defendant to take the stand. . . ."

The question asked by the court member did no more than state in words what was clearly evident to, and well known by, every member of the court. There is no element of hostility in the question as was the case in United States v King, 12 USCMA 71, 30 CMR 71. The question contains no more than an expression of concern that procedures he recalled from "old days" be observed.

Of course, the question should not have been asked. After it had been asked, the law officer would have been well advised, in addition to the instruction given, to have included the pertinent language of Title 18, United States Code, Section 3481. That entire section reads:

"In trial of all persons charged with the commission of offenses against the United States and in all proceedings in courts martial and courts of inquiry in any State, District, Possession or Territory, the person charged shall, at his own request, be a competent witness. His failure to make such request shall not create any presumption against him."

See Wilson v United States, supra; United States v Di Carlo, supra; Bruno v United States, 308 US 287, 84 L ed 257, 60 S Ct 198 (1939); Chadwick v United States, 117 F2d 902 (CA5th Cir) (1941); Salibo v United States, 46 F2d 790 (CA5th Cir) (1931).

In this case, however, we believe the action taken by the law officer and the instruction given were adequate to remove any possible prejudice to the appellant. In addition to the reasons hereinbefore given we point out the following. The law officer responded immediately and spontaneously, without requiring defense counsel to interpose an objection which might have been disadvantageous to appellant. He clearly instructed the court that appellant was not obligated to take the stand; that no remark would be made concerning it; and instructed the court not to consider the remark of the court member. He then included a mild but very pointed rebuke to the member who posed the question by stating: "The accused, of course I would say, is represented by competent counsel." This last statement we believe to be in the spirit of the language of Mr. Justice Field in Wilson v United States, supra.

On the whole record we hold that the assignment fails to present error prejudicial to appellant. And it may be noted, in passing, that our evaluation of this matter is not out of keeping with that apparently made by defense counsel at trial, for he voiced no objection and requested no further cautionary advice by the law officer. Accordingly, the assignment of error is overruled.

Remaining for our consideration is appellant's petition for new trial, presented under Article 73, Uniform Code of Military Justice, 10 USC § 873, the same being based upon the alleged existence of newly discovered evidence. In United States v Chadd, 13 USCMA 438, 32 CMR 438, we held that a petition for new trial under Article 73

was intended by Congress to afford such remedy under the same conditions as are applied by the civilian United States courts; and that these are:

a. The record of trial, petition, and other matters presented by the accused indicate an injustice may have resulted.

b. The evidence in fact is newly discovered.

c. Due diligence to discover it was exercised at the time of trial.

d. The newly discovered evidence will probably cause a different result when presented to another court-martial.

After a careful consideration of the record of trial, the petition, and all new matters presented to us in connection with the petition, we are unable to hold that such petition presents cause for relief under the criteria above stated.

Among other considerations entering into our conclusion may be stated the following. At the trial the ▬▬▬▬ ▮ injured party, Beck, proved to be a reluctant witness. Even though he admitted he had previously identified appellant as the party who cut him and admitted that he had picked him from a lineup, he refused to positively identify him at the trial. Although prior to trial he had stated that the soldier assisting him in getting Wilkins back to the billets was named Jennings, at the trial he stated he did not remember the identity of that third soldier. Beck, in his testimony, was so uncooperative that trial counsel in one instance suggested he be declared a hostile witness. Such action was not taken, but the law officer did permit trial counsel to examine the witness on the basis of his prior sworn statements. There is nothing in the record to indicate that the defense exercised any diligence to locate "Jennings." Such effort could have reasonably produced him or led to the discovery of the individual assisting Beck, if it were not in fact "Jennings." The alleged newly discovered witness was a stockade partner of appellant who had been convicted of larceny, an offense involving moral turpitude, and was then under a sentence of confinement at hard labor for four years. He originally made an affidavit containing the statement, "The man who bumped shoulders with BECK and then apparently stabbed him was not Pfc Harold FARRINGTON whom I knew for some time prior to this incident." Upon being advised that a polygraph test[1] indicated this statement to be untrue, he was so facile that on the day of the test he made another affidavit saying that the above-quoted statement was false and that what he had actually said to defense counsel, a captain in the Judge Advocate Generals Corps, was, "that my observation of BECK's assailant looked like to me that he, the assailant, was too tall to have been FARRINGTON. . . . . I cannot definitely state that the person who stabbed BECK was not FARRINGTON." In that affidavit he accused defense counsel of having told the investigator to put that quotation in the statement and further accused defense counsel of telling him, "Don't sweat it," when he questioned the inclusion of the quotation in the statement. Defense counsel and the investigator made affidavits that the statement was typed exactly as given by the alleged witness.

The entire circumstances regarding this alleged witness, the manner and place of his production, the existence of admissible contradictory affidavits by him, the sworn statement of defense counsel in reply to an affidavit by a convicted thief, and the entire record, render it manifest that the testimony of such alleged newly discovered witness would probably not cause a different result when presented to a new court-martial.

The petition for new trial, therefore, is denied. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.

---

[1] The question does not involve the admissibility of the result of a polygraph test, but only the facility with which the alleged witness changed his affidavit when its veracity was questioned.