UNITED STATES, Appellee

v.

Henry M. SINGLETON, Private
U.S. Army, Appellant.

No. 93–1078.
CMR No. 9003055.

U.S. Court of Military Appeals.

Argued May 31, 1994.

Decided Sept. 30, 1994.

For Appellant: *William J. Holmes* (argued); *Captain Teresa L. Norris* (on brief).

For Appellee: *Captain Glenn L. Kirschner* (argued); *Colonel Dayton M. Cramer* and *Major James L. Pohl* (on brief).

*Opinion of the Court*

COX, Judge:

The instant case involves an allegation of unlawful command influence. Appellant was convicted, *inter alia*, of communicating a threat to and raping the prosecutrix, at Grafenwoehr, Germany.[1] He acknowledged that

---

1. Appellant was tried by a general court-martial which included enlisted members at Fuerth, Federal Republic of Germany. Contrary to his pleas, he was convicted of rape and communicating a threat, in violation of Articles 120 and 134,

Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. Pursuant to his pleas, he was convicted of absence without leave and adultery, in violation of Articles 86 and 134, UCMJ, 10 USC §§ 886 and 934, respectively, but the

he and the prosecutrix had consensual intercourse on the night in question, but contended that, when he left her, she was fine. The prosecutrix, a servicemember, reported for medical attention the next day with a broken jaw and severe vaginal trauma. She claimed rape and named appellant as her assailant.

The trial was a classic swearing contest. The prosecutrix described how she ran into appellant at a club; how they shared a cab to the house where she was staying; how she let appellant into the house for a drink; and how appellant forced himself on her. On cross-examination, she denied that she had a boyfriend or had been unfaithful to her husband during the 2 years she had been stationed in Germany. (She testified, however, that she had not visited her husband in the States during that time nor he her, and she had an abortion during her tour in Germany and was pregnant again before she rotated to her next post in the States.)

The unit Charge of Quarters (CQ), whom the prosecutrix called for assistance, confirmed seeing her swollen jaw the next morning. He testified that she was initially unwilling to identify her assailant "because she didn't want to get the person in trouble...." Upon being pressed by the CQ, she identified appellant. The agent of the Army Criminal Investigation Command (CID) who interviewed appellant about 9:00 or 9:30 a.m. the morning after the alleged rape related how appellant admitted having consensual intercourse with the prosecutrix the night before. The agent noticed that appellant's lip was swollen (the prosecutrix testified that she bit it). The physician who examined the prosecutrix described her injuries.

The defense led off with the testimony of a physician who examined appellant at about 1745 hours in the afternoon following the alleged rape. He detected no swelling of appellant's lip and no sign of a bite.

The next defense witness was the friend of the prosecutrix at whose house the prosecu-

trix was staying at the time of the alleged rape. The witness testified that the prosecutrix had admitted to her of having a sexual liaison with appellant prior to the night in question and that the prosecutrix tried to get the witness not to mention that fact at the pretrial investigation under Article 32, Uniform Code of Military Justice, 10 USC § 832. The witness also identified Specialist Alfred Pangelinan as the prosecutrix's boyfriend at the time of the incident. Based on the prosecutrix's trial representations in this regard, the witness considered the prosecutrix an "untruthful" person.

The next defense witness was a friend and co-worker of the prosecutrix who testified that she told him it was her "boyfriend" who "broke her jaw." Another defense witness testified to being present at the club on the night of the incident. He observed appellant and the prosecutrix "holding each other, embraced in a loving and caring manner." He saw them leave the club "arm in arm, embraced. They seemed as though they were having a perfectly good time." The witness described another incident in which Pangelinan had been enraged at discovering the prosecutrix with another man. Another witness at the club testified that the prosecutrix "looked like she had had a lot to drink"; that "[s]he was all wild; she danced all wild that night"; and that she was with appellant that night.

A forensic chemist testified for the defense that no blood was found on the clothing apparently worn by appellant on the night in question. A CID agent testified, however:

> There were blood stains all over the crime scene. There were blood stains all over the apartment. There were blood stains in the sink and on the carpet, on the bed sheet I believe also.

Lastly, appellant testified in his own behalf. He described his previous consensual sexual encounter with the prosecutrix. He also described his consensual sexual encoun-

military judge later entered a finding of not guilty to adultery as that charge was multiplicious with the rape conviction. The convening authority approved the sentence of a dishonorable discharge, confinement for 12 years, total forfeitures, and reduction to E–1, and the Court of Military Review affirmed the findings and sentence in an unpublished opinion dated April 6, 1993.

ter with the prosecutrix on the night in question.

In rebuttal, the prosecution called an "alibi" witness for Pangelinan. This witness described a night of partying and carousing with Pangelinan, which wound up back in Grafenwoehr in the early morning hours. According to the witness, he visited a girlfriend in Grafenwoehr from about 5:00 or 5:30 a.m. until about 7:30 a.m., while Pangelinan allegedly slept in the car (on December 16). Also in rebuttal, one of the defense witnesses (the one who said the prosecutrix told him that it was her boyfriend who broke her jaw) was impeached by his executive officer as being a frequent liar.

At the close of the evidence, the court members requested that Specialist Pangelinan be produced as a witness. Neither the prosecution nor the defense had thought it in their interest to present Pangelinan as their witness, and in the interval following the alleged rape, Pangelinan had been reassigned several times. At the time of the trial, he was on leave between stateside assignments and could not immediately be located. Without objection from the parties, the military judge informed the members that Pangelinan was not available; the court-martial proceeded to conclusion. Upon the evidence adduced, appellant was convicted of rape and communicating a threat, *inter alia.*

### Command Influence

The granted issue alleges command influence in that favorable defense evidence was knowingly withheld by the command and that a sergeant major (misidentified by appellant as "command" sergeant major) intimidated and threatened witnesses.[2]

■ Unlawful command influence has long been regarded "the mortal enemy of military justice." *United States v. Thomas,* 22 MJ 388, 393 (CMA1986), *cert. denied,* 479

U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). *See United States v. Morris,* 28 MJ 8, 10 (CMA1989); *United States Navy–Marine Corps Court of Military Review v. Carlucci,* 26 MJ 328, 332 (CMA1988); *United States v. Levite,* 25 MJ 334, 341 (CMA1987) (Cox, J., concurring). And we have said that

> where unlawful command influence has been exercised, no reviewing court may properly affirm findings and sentence *unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence.*

25 MJ at 338, *quoting United States v. Thomas,* 22 MJ at 394. In *Levite,* there were allegations of unlawful command influence, but no hearing was conducted pursuant to *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967), to ensure that the accused received a fair trial. 25 MJ at 339. We set aside the findings of guilty and the sentence, and authorized a rehearing based on the issue of command influence. 25 MJ at 340. This Court has pledged to "go to extraordinary lengths to be certain 'beyond a reasonable doubt' that neither the findings nor the sentence have been tainted by command influence." 25 MJ at 341 (Cox, J., concurring), *quoting United States v. Thomas,* 22 MJ at 394.

■ Nevertheless, there must be more than a mere allegation of command influence before an appellant will be entitled to relief. *United States v. Allen,* 33 MJ 209, 212 (CMA1991), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). An accused must also "show that the proceedings were unfair and that the proximate cause of the unfairness resulted from unlawful command influence." *United States v. Levite,* 25 MJ at 341 (Cox, J., concurring).

The general issue of command influence surfaced in this proceeding even before com-

---

2. The granted issue, as framed by appellant, is as follows:

WHETHER THE FINDINGS AND THE SENTENCE CANNOT BE AFFIRMED BECAUSE THEY WERE SUBSTANTIALLY AFFECTED BY UNLAWFUL COMMAND INFLUENCE WHICH DEPRIVED APPELLANT OF VITAL AND FAVORABLE EVIDENCE WHICH HAD NOT BEEN DISCLOSED AND [WAS] KNOWINGLY WITHHELD BY THE COMMAND AND OF THE TESTIMONY OF WITNESSES WHO HAD BEEN BLATANTLY INTIMIDATED AND THREATENED BY THE COMMAND SERGEANT MAJOR.

mencement of trial on the merits, but it was post-trial that it became focused and developed fully. During a pretrial session under Article 39(a), UCMJ, 10 USC § 839(a), defense counsel identified a "problem" that had arisen. In particular, counsel alleged that Sergeant Major (SGM) Efren Acosta had attempted to influence the testimony of a witness. As the witnesses to this allegation were not present, the litigation actually occurred several hours later that day, during a recess in the merits portion of the trial.

In support of its motion, the defense called Staff Sergeant (SSG) Kent I. Richardson as a witness. SSG Richardson (like appellant, the prosecutrix, and SGM Acosta) was a member of the 507th Personnel Service Company (PSC). The sergeant major was noncommissioned officer in charge of the unit's Military Personnel Office (MILPO). On the company side, the 507th PSC was commanded by a captain with a first sergeant.

SSG Richardson was slated to be a character witness for appellant. He testified that the sergeant major, his duty supervisor, found out he was to be a witness and called him in one day. According to SSG Richardson, the sergeant major reminded him that the sergeant major had been on SSG Richardson's side in helping him attempt to overcome a bar to reenlistment. Further, the sergeant major made it plain that he expected SSG Richardson to testify loyally to the unit. By that, it was clear to SSG Richardson that, if he testified favorably to appellant, SSG Richardson's career was at stake.

On cross-examination of SSG Richardson by trial counsel, the witness indicated forcefully that he was not intimidated by the sergeant major and that he was prepared to testify truthfully and completely.

The only other witness called at this point in the proceeding was SGM Acosta. Upon examination by defense counsel, trial counsel, and the military judge, the sergeant major conceded having many conversations with SSG Richardson about his bar to reenlistment and what SSG Richardson needed to accomplish and demonstrate in order to overcome the bar and become a superior noncommissioned officer. However, the sergeant major flatly denied ever having a conversation with SSG Richardson that was intended in any way to be linked to appellant's case or SSG Richardson's testimony therein.

The military judge found that a rambling conversation between the sergeant major and SSG Richardson touching upon many such subjects had indeed occurred, but that the sergeant major had not intended to intimidate SSG Richardson or influence his testimony—even though SSG Richardson perceived such a threat. Further, the military judge found that SSG Richardson was not in fact intimidated and that he was prepared to testify completely and truthfully. As the defense conceded being aware of no instance of a witness having any hesitancy to testify as a result of command influence, the judge concluded that appellant was not prejudiced.

Nevertheless, the judge granted the defense requested relief—that the chain of command be barred from attending the trial so as to eliminate any possibility of intimidating any witnesses, and further that the chain of command be specifically admonished not to take any retaliatory action regarding any witness who testified. In addition, after ascertaining that the prosecution anticipated calling chain-of-command witnesses in aggravation of sentence, the judge went the defense one better and barred the prosecution from calling any chain-of-command witnesses in aggravation. After resolution of the motion, the merits portion of the trial resumed to completion.

But the matter was far from over. Several months after the trial was completed, but before the military judge had authenticated the record of trial, the judge convened a post-trial Article 39(a) session at the request of the defense. RCM 1102, Manual for Courts–Martial, United States, 1984. In the interim since trial, according to the defense, numerous acts of retaliation had occurred against various defense trial witnesses; and new defense evidence had been discovered which could not reasonably have been discovered previously.

The post-trial session was very different from the original trial. In length, it spanned over 700 pages of record—almost twice the length of the previous trial, from court open-

ing to appellate rights' advisement. Numerous witnesses were called in the post-trial session by both sides, and the allegations of retaliation were explored in great depth. The upshot was that none of the allegations of witness retaliation panned out. The military judge's "FINDINGS OF FACT" and "CONCLUSIONS OF LAW" in this regard are thoroughly supported by the record. *See* Appendix.

The post-trial session also focused intensely on SGM Acosta and the general conduct and operation of the 507th PSC and its MIL-PO. This evidence, at times, was not pretty.[3] As a consequence, the judge changed his original finding with respect to SGM Acosta, concluding that he did indeed intend to influence SSG Richardson's testimony. Nevertheless, it remained very clear that SSG Richardson was not in fact intimidated and that he did testify truthfully and completely. Similarly, it was conclusively established that all the witnesses (against whom it was claimed retaliatory measures had subsequently been taken) testified truthfully and completely. Hence, even if they occurred, such actions could not have affected appellant's trial. Furthermore, aside from SSG Richardson, not a single witness testified that he or she had been approached or contacted directly or indirectly by the sergeant major or by any other person for the purpose of influencing, suggesting, or suppressing testimony. Accordingly, the military judge denied the defense motion to dismiss or order a new trial based on unlawful command influence.

*Newly Discovered Evidence*

■ A second phase of the post-trial session focused on the newly discovered evidence itself, which was presented in conjunction with appellant's motion for a new trial. A new trial should be granted when:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

RCM 1210(f)(2).

Again, the military judge carefully evaluated the three items of evidence tendered. One of the items he deemed not to qualify as "newly discovered," since the defense could have and should have discovered it well before trial. The other two items the judge viewed as not having sufficient apparent value to the defense as to warrant a new trial. Accordingly, the judge denied the motion for a new trial on the basis of newly discovered evidence.

We can only applaud the military judge for the Herculean measures he undertook throughout this proceeding to pierce the command veil of the 507th PSC, to ascertain truth, and to assure appellant justice. And though in a literal sense the military judge may have been absolutely justified in concluding that a new trial was not warranted, we must ultimately part company with him on this point. For this was a trial that came down to a single question: Who did the

---

3. Numerous witnesses testified for the defense about the reign of terror conducted by Sergeant Major (SGM) Acosta. The company commander acknowledged that SGM Acosta was "old Army" and that she had to speak with the sergeant major periodically to discuss the way he treated people. She estimated that "50 percent of the soldiers [in the unit] ... 'hated' the Sergeant Major." First Sergeant (1SG) Hancock described him as a "[s]tern man." 1SG Malley, 1SG Hancock's successor, estimated that "the majority" of the NCOs in the unit were "afraid" of the sergeant major. The executive officer testified that the "Sergeant Major ran that company and he made it known." The executive officer also considered the sergeant major "a liar," and testified that he had caught the sergeant major lying.

Needless to say, the military efficacy in general of the sergeant major's leadership style is not the business of this Court, and we make no judgment in that regard. (Apparently, even as the military judge here was conducting his post-trial hearing, higher military authorities were conducting their own investigation of the sergeant major. We have no cognizance of the result of that investigation.) Our concerns relate solely to his impact, if any, on appellant's court-martial.

members believe, the prosecutrix or appellant? In other words, was appellant lying when he said he had consensual sex with the prosecutrix—again; or was the prosecutrix lying when she said it was appellant that beat and raped her—rather than an enraged boyfriend? Against this backdrop, these are the items of evidence *not* before the members for consideration:

First. Sergeant (SGT) Oithip Pickert testified post-trial that she was answering the orderly room telephone immediately after the prosecutrix was released from the hospital and that a call came in for the prosecutrix. Pickert put down the phone and left to notify the prosecutrix. When Pickert returned to her desk, she

> picked up the phone to see if she had picked up the phone. And then I heard this guy's voice saying, "Did you open your mouth?" And Loveland [the prosecutrix] kind of go, "No," and then he said, "Well, if you do I'm going to kill your ass."

From the accent of the male voice, Pickert identified "her boyfriend," Pangelinan. It definitely was not appellant.

According to her testimony, SGT Pickert notified the first sergeant that "[i]t's Loveland's boyfriend on the phone threatening her." The first sergeant cautioned SGT Pickert about listening in on phone conversations and said he would take care of it. SGT Pickert, scheduled soon to be transferred out of the 507th PSC, was one of many servicemembers scared to death of SGM Acosta. Therefore, she left the matter entirely in the first sergeant's hands, not wishing to incur the inevitable wrath of the sergeant major, well knowing how he wanted appellant out of the Army.

The first sergeant, Sergeant First Class (SFC) Benjamin L. Hancock, testified that he remembered the incident generally. He recalled SGT Pickert saying "that Loveland's boyfriend [was] talking to her on the phone.... And evidently [saying] some bad things." He cautioned SGT Pickert not to listen in on phone conversations. SFC Han-

cock did not specifically connect the phone incident with the alleged rape by appellant. However, as he understood the boyfriend "must be threatening her [the prosecutrix] for some reason ... [he said], "I'll take care of that as far as that information," and he mentioned it to the CID agent and the company commander.

The CID agent could not recall for certain whether the first sergeant had mention a threatening phone call, but he might have.

And there the matter died—until after the trial was completed. SGT Pickert transferred out of the unit and assumed her information was being duly transmitted to appropriate authorities. Only after she found out that appellant had been convicted did she discover that the ball had been dropped, and she approached the defense.[4] Although SGT Pickert's actions might be attributed to "command" fear, they were not a result of command influence. It does not appear that SGM Acosta had any idea SGT Pickert might have some information or that he or anyone else made any effort to influence her potential testimony.

Second. Specialist (SPC) Patricia K. Laster testified that she was the prosecutrix's roommate at the time of the alleged rape, and she was friends with both the prosecutrix and appellant. Laster visited the prosecutrix at the hospital several days after the incident.

According to Laster:

> When I first walked in the room and she saw me, she started crying and she had her arms out and I went to her and we hugged for awhile. And then I told her I wanted her to tell me exactly what had happened. I wanted to hear it from her. And then she started—she told me that they—she had went to the Club that night. She had saw Singleton. He had just came back off from leave. When she first saw him, they hugged and later on she danced with some more guys and, later on, he told her he needed to talk to her about something. So they went to Rayford's house.

---

4. In the granted issue, appellant labels 1SG Hancock's failure to transmit the information as command influence by knowingly withholding favorable defense evidence. The military judge's rejection of this theory is eminently correct. *See* Appendix.

They looked at a movie for about forty-five minutes. She said she had asked him to leave but she passed out. . . .

As Laster explained, the prosecutrix

used to drink a lot and then she would have "blank-outs" and stuff like that.

As to who assaulted her:

She wasn't sure. She told me that she knows she passed out, that Singleton was there. When she woke up, her mouth was hurting, and she did not know what to do so she called the CQ desk. She knew she had to get her mouth taken care of, but she said she was confused because she didn't know.

Laster was interviewed by the defense prior to the court-martial, but she withheld the above information from them at that time. She testified that her reason for withholding the information was that she was friends with both her roommate and appellant; that she assumed her roommate would do the right thing and tell the truth; and that she thought it unnecessary to get involved between her two friends at that time. It was not until after appellant was convicted that the witness realized that her roommate had lied after all. Laster made no mention of SGM Acosta or any command figure as having any role in her initial decision to withhold evidence.

The foregoing were the two items the military judge acknowledged could not reasonably have been discovered by the defense. However, the judge concluded that the former matter, the threat, "would have little weight" because it was not clearly linked to the alleged rape incident. The second matter, the judge reasoned, would only have been admissible to impeach the prosecutrix. Suffice it to say, we take a very different view of the potential significance of this information in light of the evidence in this case. We consider the alleged threat by Pangelinan, if believed, to be highly germane to the question of who assaulted the prosecutrix, given the alleged relationships of the parties and the time and circumstances of the alleged threat. As to the impeachment evidence, that also goes directly to the central issue of this case.

Third. The third item—the matter the judge concluded should have been discovered by the defense prior to the court-martial—concerned the following astonishing revelation. Recall that the prosecution bethought it advantageous to call an "alibi" witness for the missing Pangelinan. That witness was SGT David C. Key. Though Pangelinan himself was not considered useful, the prosecution summoned Key all the way from Saudi Arabia to vouch for Pangelinan as a proxy. Recall further that Key had testified that, early in the morning (close to the time of the alleged rape), he and Pangelinan returned to Grafenwoehr—Key to visit a lady friend, Pangelinan supposedly to sleep in the car.

However, SGT Solomon McCluster testified in the post-trial session that he was a member of the 507th PSC and happened to be a spectator at appellant's court-martial. After the trial was over, according to McCluster, he had an opportunity to talk to the witness, Key. His curiosity peaked, McCluster asked Key exactly where his lady friend's house was in Grafenwoehr. It turned out, allegedly, that on that December morning near the time of the offense, Pangelinan was parked a mere 150–200 meters from the very house where the prosecutrix was! Both residences, it seems, were close to a place well known to McCluster, the Life Disco.

Pangelinan himself was produced and testified at the post-trial session. He acknowledged having a sexual relationship with the prosecutrix; denied assaulting her; denied making a threatening phone call to her; acknowledged knowing where she was staying at the time; but denied realizing where he was that morning when Key left him in the car.

Suffice it to say, these three representations give us pause as to the completeness of the factfinding process. Obviously, they have not been tested in the crucible of trial, and we can intimate no judgment whatever as to the ultimate conclusions of veracity or weight a factfinder might attach to them. Nevertheless, whether we ascribe their absence from the process to the fog of command influence, the inability of counsel to

ascertain the facts, misguided friends, pusillanimous witnesses, outright perjury, or just plain bad luck, this trial has to go back to square one. On this record, despite the best of intentions and efforts of the military judge, we cannot conclude, in a due process sense, that appellant has yet enjoyed a full and complete trial. Far too much of the information that needed to be evaluated by a factfinder, in order to assess appellant's culpability, was not. We conclude that the military judge abused his discretion in concluding that the evidence probably would not produce a substantially more favorable result for appellant. RCM 1210(f)(2)(C); Art. 73, UCMJ, 10 USC § 873.

In his petition for review to this Court, appellant raised this issue:

> WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL AND REVERSIBLE ERROR BY REFUSING TO GRANT A NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED EVIDENCE WHICH WAS HIGHLY RELEVANT AND DIRECTLY MATERIAL BY SHOWING THAT SPC PANGELINAN, RATHER THAN APPELLANT, COMMITTED THE CHARGED OFFENSES.

This Court denied review of the new-trial issue. We now reconsider our decision to deny review of that issue, and we grant review of it.

The decision of the United States Army Court of Military Review as to the specification of Charge I and specification 2 of Charge II and the sentence is reversed. The findings of guilty thereon are set aside. The record of trial is returned to the Judge Advocate General of the Army. The sentence may be set aside and a new trial may be ordered; or those specifications may be dismissed, the adultery specification may be reinstated, and a rehearing on sentence based on the adultery and the unauthorized absence offenses may be ordered.

Judges CRAWFORD, GIERKE, and WISS concur.

## APPENDIX

### FINDINGS OF FACT

Based upon the evidence presented on this issue of alleged unlawful command influence, I find that the commanding officer of the 507th Personnel Company and the officer in charge of the Grafenwoehr MILPO, Captain Myers, overly relied on the advice of Sergeant Major Acosta to the point where he was running the MILPO and the 507th Personnel Company. Sergeant Major Acosta was technically proficient. His leadership style was described as "Old Army," but was really a leadership style of intimidation. The members of the unit correctly believed that the sergeant major and not the first sergeant or the commander controlled the unit and the MILPO. The majority of the NCOs and soldiers were afraid of the sergeant major because of ... [the] abusive language he used when counseling or dealing with NCOs or soldiers. There was also a perception in the unit that the sergeant major took care of the individuals he liked, and would exploit the mistakes or conduct of people he did not like, and take adverse action against them. The accused fell into the category of soldiers who the sergeant major disliked. This resulted from confrontations the accused had with Sergeant Major Acosta concerning unit sports events, and the fact that the accused was frequently late for work. Members of the unit, including Staff Sergeant Hart, Sergeant Sampson, Sergeant Key, Staff Sergeant Taylor, Specialist Mutunhu, Sergeant Groves, Sergeant Torres, Sergeant Pickert, and Sergeant Richardson believed that the sergeant major did not like the accused. However, there is no evidence that the sergeant major tried to threaten or exploit the accused. Although Sergeant Taylor and Mutunhu were not asked to testify at the trial, they would testify truthfully in any future trials. There is no evidence that anybody in the unit refused to testify in this case on the merits or in extenuation and mitigation. Staff Sergeant Richardson had significant problems in the unit. He was on the E–7 promotion list, but was not promoted because he had a bar to reenlistment and was flagged as a result of an Article 15 for a DUI, failed

SQT tests, and failed PT tests. He had an ongoing problem since June of 1990 with finance because he was being paid as an E–7. This was not resolved until February '91. This problem, the attempts to resolve it, and the final resolution had nothing to do with this case. On the day before trial, Sergeant Richardson and Sergeant Major Acosta were at Amberg to set up for a POM. After their duties were completed, Sergeant Major Acosta offered Sergeant Richardson a ride home. They had a lengthy discussion which commenced at the site and continued in the sergeant major's car on the way home. They discussed various topics, including unit business, the number of witnesses involved in the accused's court-martial, NCO values, and Sergeant Richardson's bar to reenlistment. The bar to reenlistment was a frequent topic of conversation between Sergeant Richardson and Sergeant Major Acosta. They discussed the fact that Sergeant Richardson was going to testify with respect to favorable character evidence and duty performance of the accused. They discussed the recent appointment of Sergeant Richardson to an E–7 position and the customer service office at the MILPO, and that the sergeant major would help him get, that is, Sergeant Richardson get his bar to reenlistment removed. The sergeant major then talked about loyalty to the unit. Sergeant Richardson interpreted the sergeant major's comments concerning removing the bar and loyalty to be a threat by the sergeant major not to have the bar removed if Sergeant Richardson testified. Based upon the additional evidence I have heard concerning Sergeant Major Acosta's leadership style and methods of running the unit, I find that he did intend to unlawfully influence the testimony of Sergeant Richardson. Therefore, I have reconsidered and changed my original findings on this issue. However, I still find that Sergeant Richardson was not intimidated and that he did provide complete and truthful information when he testified during the presentencing portion of the accused's trial, and if he were called upon to testify again that he would not be intimidated and would continue to testify truthfully. I also find that the discussions

which Sergeant Major Acosta had with Lieutenant McDeed in which he recommended that Lieutenant McDeed mention Sergeant Richardson's two SQT test failures in his NCOER were not made in an attempt to punish Sergeant Richardson for his testimony in favor of the accused. The sergeant major's recommendation was reasonable and appropriate. With respect to Sergeant Robert Jenkins, I specifically find that prior to trial he was performing duties as a unit supply sergeant. The day prior to his departure to Fort Eustis, Virginia, to attend BNCOC, the commander, Captain Myers, was informed that her supply room failed inspection. She allowed Sergeant Jenkins to go to BNCOC and delayed taking action against him. Lieutenant McDeed was put in charge of the supply room and was aware of Jenkins' substandard performance. The command contemplated either relieving him or having him transferred to another unit. They ultimately decided to transfer him. Sergeant Jenkins was subpoenaed as a witness for this court-martial. He came to the Nuernberg Law Center where the courtroom is located, directly from the airport, and testified for the accused on the merits of the case. Sometime after he testified, Lieutenant McDeed ordered the first sergeant, that's Sergeant Malley, to take the keys to the supply room key box from Sergeant Jenkins. He did this because Lieutenant McDeed was contemplating relieving Jenkins and did not want Jenkins to have access to the arms room. Subsequent to Jenkins' testimony, while he was in the witness waiting room, First Sergeant Malley asked him to come out into the hallway and they went to the first floor of the Law Center where she ordered Sergeant Jenkins to return the supply [room] key box keys. This decision to take the keys at that time was Lieutenant McDeed's. Although the decision to take the keys in the area of the courtroom was a bad decision, the keys were taken as a result of Jenkins' substandard performance as a supply sergeant, not to punish him for his testimony. The commander's decision to relieve him or transfer him also was not made to punish him for his testimony, but was made because of his

substandard performance as a supply sergeant.

With respect to Sergeant Robert S. Groves, I specifically find that he testified truthfully at the trial and no attempts were made to unlawfully influence his testimony. I also find that he would testify truthfully at any future trials and that there were no adverse repercussions taken against him by Sergeant Major Acosta or other members of the command as a result of his testimony in favor of the accused. The disagreements he had with Sergeant Major Acosta over Ms. Goodman and with the command over actions Sergeant Groves recommended be taken on one of his subordinates amounted to professional disagreements which were not relevant to this case.

I specifically find that Sergeant Torres testified truthfully at the trial and would testify truthfully at any future trials. There were no attempts to unlawfully influence his testimony.

With respect to Staff Sergeant Hart, there were no adverse repercussions taken against him because he served as a bailiff at the trial.

Because of the requirement to conduct POMs on short notice, Captain Myers had a policy that members of her unit had to respond to the POM mission within two hours after they were called and ordered the troops to conduct their personal lives so that they were able to come to work sober after being called. This was a prudent policy. The sergeant major smelled alcohol on Sergeant Hart, and the commander properly ordered a breathalyzer test. Sergeant Hart had alcohol on his breath, but was within the legal limits.

With respect to the allegation of unlawful command influence by Sergeant First Class Hancock on Sergeant Pickert I make the following findings of fact: Sergeant Pickert answered the unit telephone and was requested by the caller, whom she believed to be Specialist Pangalinan, to get Specialist Loveland to the phone. She called Specialist Loveland and later picked up the phone to see if Specialist Loveland answered it. Sergeant Pickert overheard the male party saying, "Did you open your mouth? If you do, I'm going to kill your ass." Pickert put the phone down and ran across the hall to Sergeant First Class Hancock's office and informed him that Loveland's boyfriend was threatening her on the phone. Sergeant First Class Hancock, who was the unit first sergeant at that time, told Pickert that she should not be listening on the phone and she could go to jail for that. Sergeant First Class Hancock stated that he would let the commander know about the incident. She did not report the incident, because she believed the first sergeant would take care of it. Sergeant First Class Hancock did not attempt to unlawfully keep Pickert from reporting the incident. He sincerely believed that it would be unlawful to listen in on a telephone conversation and that's why he told her she could go to jail for listening. Sergeant Pickert was not asked to testify at the accused's trial, and there was no unlawful command influence to keep her from testifying. If requested as a witness she would testify truthfully at any future trials.

With respect to the witnesses' for the accused Service Members Information Files or SMIF files, I specifically find that the files were normally kept in a filing cabinet in the unit orderly room. Prior to the trial Captain Myers was getting frequent requests from counsel for information on witnesses which were contained in the files. Because of the numerous inquiries for information in the files, she asked for all the witnesses' SMIF files and brought them to her office at the MILPO. At the request of the prosecution she brought the files to the trial with her. After the trial she brought the files back to the MILPO and put them in a shot-gun envelope in her out-box for return to the company. The sergeant major's office is near hers. The files got into the sergeant major's out-box and were not in a shot-gun envelope. They were later returned to the company orderly room. The witnesses' SMIF files were pulled so it would be convenient for Captain Myers to respond to information requested by counsel. Although they were returned to the orderly room by way of Sergeant Major Acosta's out-box, Sergeant

Major Acosta did not review the files after the trial.

## CONCLUSIONS OF LAW

I make the following conclusions of law based upon those special findings of fact: I am convinced beyond a reasonable doubt that:

First, Sergeant First Class Hancock did not attempt to unlawfully prevent Sergeant Pickert from testifying or providing evidence to anybody in this case;

Second, Sergeant Jenkins was reassigned and required to turn over the keys to the supply room key box because of his substandard performance of duty as supply sergeant and not because he testified in favor of the accused;

Third, that the witnesses' Service Member Identification Files were pulled by the company commander, Captain Myers, to aid her in responding to inquiries by counsel, and were not used by Sergeant Major Acosta or her to look for adverse action to take against the accused's witnesses;

Fourth, there were no attempts made by Sergeant Major Acosta to unlawfully influence the testimony of Staff Sergeant Groves, and there were no adverse actions taken against him as a result of his testimony at trial;

Fifth, Sergeant Torres' testimony was truthful and there were no direct attempts by Sergeant Major Acosta to influence his testimony;

Sixth, there was no adverse action taken against Sergeant Hart because he served as bailiff at the trial;

Seventh, that the accused's VI Amendment Rights for access to witnesses was [sic] not violated;

Eighth, that Sergeant Major Acosta did not request Lieutenant McDeed to place adverse information in Sergeant Richardson's NCOER because of Sergeant Richardson's testimony in favor of the accused.

I further conclude, as a matter of law, that Sergeant Major Acosta did attempt to unlawfully keep Sergeant Richardson from testifying favorably for the accused at the presentencing portion of the trial. However, notwithstanding the attempted unlawful command influence, Sergeant Richardson was not intimidated and provided complete and truthful testimony during the presentencing portion of the trial. Therefore, I'm convinced beyond a reasonable doubt that the findings and sentence have not been affected by the attempted unlawful command influence and the accused was not prejudiced. Accordingly, the motion to dismiss the charges and specifications and/or order a new trial based upon unlawful command influence is denied.

SULLIVAN, Chief Judge (concurring):

I completely agree with Judge Cox's excellent factual analysis of this case and his conclusion that three material items of evidence were improperly denied to the factfinders. We'll never know whether the search light which the court-martial panel was using to see the truth in this case failed to fall on this evidence because of the thick fog of command influence or the patchy smog of a complex and confusing trial. However, from our position, on an elevated slope of the mountain of appellate review, enough of the mist has burned off to show us that appellant did not receive a full and fair trial.