UNITED STATES, Appellee

v.

Linda K. SZTUKA, Major
U.S. Air Force, Appellant.

No. 94–1395.
CMR No. 29632.

U.S. Court of Appeals for
the Armed Forces.

Argued Aug. 4, 1995.

Decided Sept. 29, 1995.

For Appellant: *Major Ormond R. Fodrea* (argued); *Colonel Jay L. Cohen* (on brief).

For Appellee: *Captain Jane M.E. Peterson* (argued); *Colonel Jeffery T. Infelise, Colonel Thomas E. Schlegel, Captain R. Scott Howard* (on brief).

*Amici Curiae urging reversal:*

*Edward M. Cramp*—law student (argued); *Marc Grinker* (on brief)—For Chicago–Kent College of Law.

*Jennifer H. Gong*—law student (argued); *Thomas M. Haney* and *David W. Ellis* (on brief)—For Loyola University Chicago School of Law.

*Katrina Sifferd*—law student (argued); *Howard Rubin, Tom Routh* (law student), *Heath Sherman* (law student) (on brief)— For DePaul University College of Law.

*Opinion of the Court*

WISS, Judge:

1. This is an appeal from separate decisions of the United States Air Force Court of Military Review[1] denying appellant's petition for new trial based on newly discovered evidence (August 11, 1994) and upholding the military judge's denial of a defense motion to suppress the results of a urinalysis on the ground that the search authorization underlying the urinalysis was without probable cause (August 10, 1994). *See* RCM 1210(f)(2) and Mil.R.Evid. 315, Manual for Courts–Martial, United States, 1984. We have fully considered the entire record, briefs and oral argument[2] of the parties, and written and oral presentations by three *amici curiae*.

2. Now, we hold that the Court of Military Review abused its discretion by concluding that appellant has not carried her heavy burden of demonstrating that "[t]he newly discovered evidence, if considered by a court-martial in light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." RCM 1210(f)(2)(C). Consequently, the court below erred in denying her petition. In light of the remedial action that flows from this holding, we decline to address the search issue because it is not ripe for appellate consideration.

I

3. This case has a long history that, regrettably, does not lend itself to brief yet adequate summary. As the military judge said of this case following a post-trial fact-finding hearing, *infra:* "Sadly, it has taken on some aspects of a judicial afternoon soap opera."

A

4. Appellant's travails began on October 12, 1990. On that date, appellant—an Air Force nurse then holding the rank of Major with over 15 years' military service—married Captain (Capt) Sztuka—an Air Force jet pilot—in a display of the seize-the-moment fervor that sometimes accompanies the immediate pendency of an overseas send-off to war. "[W]ithin a couple of days" of the civil ceremony, Capt Sztuka deployed to Saudi Arabia in support of Operation Desert Shield/Desert Storm.

5. Notwithstanding their union, appellant continued to maintain a separate residence for herself and her daughter (by a previous marriage) a few doors away from her husband's. Early on, she came to believe that her marriage had been a "serious mistake," and she made plans to annul it. She delayed her plans, however, while her husband was deployed.

6. Capt Sztuka returned temporarily for a 5–week period from the beginning of December to early January 1991. During that

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. This case was argued in Chicago, Illinois, at the American Bar Association's Annual Meeting. *See* 38 MJ 136, 137 n. 1 (CMA 1993).

time, appellant tried to convince him that their marriage would not work, but "[h]e would not accept it." As appellant described her husband's response:

He became very threatening towards me. He would alternate. He was vacillating. One day he would threaten me, bully me, curse me out and the next day he would be crying, begging, pleading with me to stay, telling me I was—you know, he was crazy about me, couldn't live without me. He was also drinking very heavily during this time which I think influenced—which I know influenced a lot of his behavior and my responses.

7. After these several weeks together, appellant "had definitely made up in [her] mind this is what [she] needed—[they] needed to do, split up and go [their] separate ways." She had received an Air Force Institute of Technology (AFIT) scholarship assignment to get her master's degree in nursing beginning the next fall; she originally had planned a "joint spouse assignment" in their current locale but changed those plans in light of her marital developments to an assignment at a school in New York.

8. Appellant told her husband of her change of assignment on February 28, 1991, and he "was furious." Upon his return on March 5 he, "again, went into his pattern of the heavy drinking, the threatening, pleading, cajoling." According to appellant, he threatened: " 'You are not going to dump me. You are not getting a divorce. You are not going to AFIT. You are going to get hammered. I am going to make sure of it.' "

9. Capt Sztuka's pattern of darting back and forth between threats and pleas continued from his return on March 5 to March 9. On the morning of the latter date, appellant testified that she and her drunk and belligerent husband had yet another scene over her plans to leave him. "He told me, 'Well, you are not going to AFIT again. You are not going to New York.' He said to me, 'You are hammered, you just don't know it yet.' "

10. About 10:00 that night, agents of the Air Force Office of Special Investigations (OSI) came to appellant's house and informed her that they had her husband's consent to search it. After searching her house for 2 hours, the agents asked her to go with them to the hospital to give a urine sample for testing. While the search proved uneventful, the urinalysis ultimately was reported positive—although only 18 nanograms per milliliter above the Department of Defense cut-off level of 150 ng/ml.

11. Appellant described her reaction to the news of her urinalysis report as being "totally shocked. I had no reason to believe that urinalysis would—it would come back positive." She mentally thought through various possible explanations, rejecting each in turn as implausible. Then, she thought of one that was not so implausible. She explained it as follows:

I had worked late that Friday night [March 8] in my job and I came home with my daughter. Jan [Capt Sztuka] came up to the house shortly after that. I remember we had some words. I went upstairs with my daughter for awhile and I came down and he said, "Here, why don't you eat something?" He had been in my kitchen and heated me up a bowl of this Cajun type gumbo that I had had in the refrigerator. I had prepared it early that week for—actually, in anticipation of his homecoming. It just seemed a little odd to me, in retrospect, that, number one, he fixed me something without me asking him to do so. He normally did not fix me food. I normally was the one around the kitchen. It was also unusual in the fact that he did not eat any of it. I asked him—I remember asking him, "Well, aren't you going to have any of this?" He said, no, he wasn't hungry at the time. But he normally really likes this gumbo and it was one of his favorites and he ate a sandwich right after that, as I can remember. It just seemed, in retrospect, odd to me.

12. Ultimately, it came to light that, on March 9—the day after Capt Sztuka had prepared appellant a bowl of gumbo (in fact, she consumed another bowl of it on March 9)—Capt Sztuka had made a sworn statement to the OSI. He had told them that, on that day, he had smelled marijuana on his wife's person and had seen a baggie of it in

her bathroom. This precipitated the search of appellant's home and the probable-cause-based urinalysis just discussed.

## B

13. At her trial in August 1991, appellant denied using marijuana and presented the evidence of possible innocent ingestion summarized above. In essence, she asserted that her husband—distraught over the breakup of their marriage—had put marijuana in the gumbo to set her up and then had made the false allegations against her. In support of her theory of defense, she had introduced into evidence a packet of papers that she had found in her husband's residence while searching for their marriage certificate. The packet included a magazine article entitled, "Truth in Drug Testing," and several pages of her husband's handwritten notes. The defense argued that certain entries could be read to indicate Capt Sztuka's knowledge of surreptitiously insinuating marijuana into someone's system through other vehicles—like, in this case, food.

14. For its part, the prosecution relied primarily on the report of the low-level-positive urinalysis, expert testimony explaining the report, and a redacted version of Capt Sztuka's sworn statement to the OSI. Therein, he stated: "On 9 Mar 91, I smelled marijuana on LINDA's person. In the bathroom was a small plastic baggie with marijuana in it." The military judge admitted the statement under the hearsay exception of Mil.R.Evid. 804(b)(5) when Capt Sztuka invoked his spousal-incapacity privilege and refused to testify. See Mil.R.Evid. 504(a) ("A person has a privilege to refuse to testify against his or her spouse.").

15. In the end, as has been indicated, appellant was convicted as charged.

## C

16. In the Court of Military Review, appellant moved for a new trial based on newly discovered evidence that Capt Sztuka had admitted to First Lieutenant (Lt) Rebecca Guest—an Army National Guard officer who was his paramour from September 1991, a month after appellant's trial but a month

before appellant's divorce from Capt Sztuka, until August 1992—that he had put marijuana in appellant's food. Specifically, on November 18, 1992, Lt Guest had made a sworn statement to the OSI that in part reads as follows:

On 18 December 1991 Captain Jan Joseph Sztuka ... made a statement concerning his ex-wife, Major Linda Taylor [Sztuka]. He stated that he had put marijuana in his wife's food and later called the OSI to turn her in. Captain Sztuka said that he had placed marijuana in her food because she was going to leave him. He stated, "I told her I was going to hammer her. I told her that morning." Captain Sztuka made the same statement to me at a later date but I am not sure of the exact date.

Lt Guest stated, as well, that she had told OSI agents about these admissions on August 7 and 17, 1992.

17. Concluding that it needed additional information "on which to assess the merits of the petition," the Court of Military Review ordered a factfinding hearing, see *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967), to be conducted by the same military judge who had presided at appellant's court-martial. The court below directed the military judge to

hear the testimony of Rebecca B. Guest, Captain Jan Sztuka, and any other testimony or documentary evidence deemed relevant to the issue of the hearing, assess the credibility of the witnesses, and enter findings of facts on the truthfulness of the assertion in issue, whether the information truly is newly discovered, whether the defense exercised due diligence, and any other findings which may aid this Court in discharging its responsibility under Article 73, UCMJ [, 10 USC § 873].

## D

18. The limited hearing produced a classic credibility battle. First, Lt Guest testified that she had begun to date Capt Sztuka in September 1991. They cohabited in his residence for several months; and even after she returned to her own residence, they con-

tinued to be intimate until May 1992. Finally, their relationship terminated in August 1992 when Capt Sztuka informed her that he was engaged to another woman.

19. Consistent with her affidavit, she averred that Capt Sztuka had admitted to her that he had put marijuana in appellant's food. She testified that, in December 1991, while in a drunken, crying stupor, Capt Sztuka had told her, " 'I put it in her food, put dope in her food.' " Further, she revealed that on another occasion, again while in a drunken tirade, Capt Sztuka had stated, "I slammed her."

■ 20. When their relationship ended in August 1992, Lt Guest reported Capt Sztuka to the OSI for adultery and for having told her at some point that he could arrange a murder for hire for as little as $500.00. She testified that, at the same time, she revealed to the OSI his admissions regarding putting marijuana in appellant's food, though they did not seem too interested in that. She denied anger toward Capt Sztuka and asserted that her motive was to expose him as "unstable. He's a drunk, as far as I am concerned, and I do not think he needs to be flying airplanes. It's as simple as that."

21. Anticipating that Lt Guest's credibility would be challenged by the Government, the defense sought to bolster her story by the testimony of Joy Lieblong, a 20–year friend of the lieutenant. Ms. Lieblong testified that Lt Guest had told her about Capt Sztuka's admissions in December 1991 on the night after Capt Sztuka had made them. Of course, that was long before Lt Guest was jilted by Capt Sztuka, so the lieutenant's statement to Ms. Lieblong was admissible to rebut any inference that these allegations were a recent fabrication by a spurned lover. *See* Mil.R.Evid. 801(d)(1)(B); *United States v. McCaskey*, 30 MJ 188, 192 (CMA 1990).

22. At this point, Lt Guest's co-star in this episode of the soap opera, Capt Jan Sztuka, entered the witness box with his defense counsel at the ready in the courtroom. The essence of his testimony may be summarized as: adherence to his pretrial statement that had been admitted into evidence at appellant's court-martial; denial of

having made the admissions in question to Lt Guest; and insistence that he had not set up his wife. The record of his testimony, however, depicts a witness who frequently claimed that he could not remember at convenient points in the questioning; often evaded answering difficult questions and ultimately did so, if at all, only when doggedly pursued by defense counsel; and on occasion, after repeated and focused questioning by defense counsel, ultimately acknowledged what earlier he had denied.

23. It is impossible, however, to capture and appreciate the true flavor of his testimony—and through that testimony, a snapshot of his character—without a lengthy verbatim recital of much of the dialogue during his moment in the spotlight. Accordingly, we have attached such a recital as an appendix to this opinion.

24. Finally, there are some loose ends regarding this hearing. The transcript of the taped conversation allegedly between Capt Sztuka and appellant that is discussed during Capt Sztuka's testimony, see appendix, is of somewhat limited help substantively. More importantly, however, it is revealing of the defense's depiction of Capt Sztuka's character and is consistent with the tone of his examination at the *DuBay* hearing quoted in the appendix. For instance, when discussing the possibility of getting some unidentified woman to admit to putting marijuana in appellant's food, the following exchange occurred in the taped conversation between appellant ("L") and Capt Sztuka ("J"):

L: I was just thinking about this thing you were talking about, about how is this new "evidence" is supposed to be introduced?

J: Oh, all of a sudden, she comes in and says, "I can't stand it anymore. I heard about this from Sharon; all of a sudden, Linda's in trouble! Must have been my cookies. I felt like shit for a couple of weeks, but I can't take it anymore. Had to tell her."

L: More than "a couple of weeks."

J: Yeah, but she didn't hear about it until two weeks ago! It takes time for the

grapevine to work. Oh, Linda, it's airtight!

L: Think so?

J: Yeah!

L: How did you ever come up with this idea?

J: I'm smart! Smart enough. I'm a sly little sneaky shit. Smart enough to come up with ideas to keep my ass out of trouble!

25. Still later in their taped conversation:

L: I don't know, it sounds pretty scary to me!

J: It sounds kind of exciting to me, in a way.

L: It does?

J: Yeah.

L: How?

J: It does!

L: Exciting?

J: Yeah, in a way. Beat the law at their own game. Kind of exciting, in a way.

26. Four other witnesses testified to round out the evidence at this hearing. Appellant's civilian defense counsel from her court-martial indicated that he had known of the taped conversation just referred to but had decided against using it without some corroboration of what it seemed to be saying. When asked by defense counsel whether he would have used it had he had such corroboration (in apparent reference to the newly discovered Lt Guest), he said he would have felt compelled to do so.

27. Then, Maj Pecinovsky, who was the staff judge advocate referenced during Capt Sztuka's testimony, *see* appendix, confirmed that, indeed, he had suspected the captain of drinking alcohol prior to appearing at appellant's court-martial; further, he had written a letter to that effect to Capt Sztuka's command so that it could be considered in making the decision to give the captain the punishment under Article 15, Uniform Code of Military Justice, 10 USC § 815, also mentioned during the testimony. Winding up, the two OSI agents who Lt Guest talked to in August 1992 each testified that, to their recollection, Lt Guest had never mentioned to them any purported admissions to her by Capt Sztuka about having slipped marijuana into appellant's food.

E

28. The military judge concluded the hearing by advising the parties that he would enter specific findings at some point prior to authenticating the record. The judge entered those findings on November 1, 1993. Pertinent parts read as follows:

[ (5) ] When all of the evidence adduced at the hearing is analyzed, it becomes obvious that *the issues to be resolved rest on a foundation of the credibility of the two witnesses—Rebecca Guest and Capt Jan Sztuka.* ... I was taxed with the responsibility of evaluating the testimony of these two witnesses and then to issue findings of fact on the truthfulness of the assertion in issue. That is a task which is most difficult in this case....

[ (6) ] ... *I cannot find Rebecca Guest to be a credible witness.* Interesting but not credible is, in my opinion, a fair description of that witness' testimony.

*Only two other items of evidence tend to possibly lend credibility to her testimony—(1) the testimony of Joy S. Lieblong and (2) the clandestine pre-trial tape recording of a conversation between the accused and Capt Jan Sztuka* in evidence as Appellate Exhibits XXXII and XXXIII.

[ (7) ] In my opinion, *the taped conversation can be subject to several interpretations* inconsistent with corroborating the testimony of Guest, just as easily as it can be used to lend credibility to that post-trial testimony. Additionally, *although the testimony of Joy S. Lieblong does tend to lend some credibility to Rebecca Guest as a witness, that testimony also relates back to Rebecca Guest herself as a source.* I find that it does not lend sufficient credibility to her testimony in view of the dollops of other evidence tending to adversely reflect on her credibility.

[ (8) ] Rebecca Guest's testimony also must be viewed in the context of Capt Jan Sztuka's clear testimony to the contrary. *Although the career of this Air Force offi-*

*cer since the trial has not struck a note tending to support his credibility, I can find no basis to reject that testimony out of hand....*

*Conclusion*

I do not find from the testimony of Rebecca Guest credible evidence sufficient to constitute newly discovered evidence within the meaning of RCM 1210. In view of the testimony of Capt Jan Sztuka clearly contradicting Rebecca Guest and the inadequacy of corroborating evidence, no other finding is warranted, despite evidence detracting from Capt Sztuka's credibility....

(Emphasis added.)

**F**

29. On this record, the Court of Military Review considered appellant's petition for a new trial. After setting forth the legal standard justifying a new trial, *see* RCM 1210(f), the court set out to evaluate the testimony of Lt Guest in terms of "its veracity and its probable impact at another trial." Aug. 11 unpub. op. at 5. "[A]s did the military judge, [the court] simply [found] Lt Guest unworthy of belief." *Id.* at 7. It pointed "to her motive to fabricate" (apparently in reference to being a woman scorned) and to the "emphatic ... testimony" of the OSI investigators that, contrary to Lt Guest's equally emphatic testimony, she had not told them in August 1992 of Capt Sztuka's purported admissions. Aug. 11 unpub. op. at 7.

30. The court minimized the importance of, or did not mention at all, the two pieces of evidence that might tend to support Lt Guest. As to the first—the taped conversation between appellant and her husband prior to her court-martial—the court stated: "[T]o say it is subject to interpretation is to place it in its most favorable light." *Id.* at 7. Also, the court noted that, while appellant had alluded to the transcript of the tape during her trial, she had not offered it into evidence. In a footnote, the court made reference to the *DuBay* testimony of the civilian counsel who had defended her at her court-martial that he had made "a tactical decision ... not to offer the 'transcript' due

to is susceptibility to interpretation." *Id.* at n. 4. As to the second—Ms. Lieblong's testimony that Lt Guest had revealed to her Capt Sztuka's admissions long before Lt Guest had an apparent motive to fabricate as a jilted lover—the court curiously made no mention of it at all.

31. In contrast to Lt Guest, the court found "Capt Sztuka's testimony quite plausible." The court commented: "He testified the taped conversation with petitioner prior to her trial occurred as a result of her asking him to either say he put marijuana in her food or that someone else did." In similar manner, the court below cast aside appellant's plea "that she should receive a new trial so she may cross-examine Capt Sztuka." In doing so, the court reasoned: "In view of the evidence, ..., we do not find this argument persuasive. Capt Sztuka having received nonjudicial punishment [Art. 15] for driving while intoxicated, and the apparent difficulties in his personal life, do not give us reason to conclude that he lied under oath." Aug. 11 unpub. op. at 8.

32. Concluding, the court stated:

The evidence developed at the *DuBay* hearing completely refutes Lt Guest's testimony. *See United States v. Cosner*, 35 MJ 278, 281 ( [CMA] 1992). Therefore, we are convinced that the proffered newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, *probably would not* produce a more favorable result for petitioner.

Aug. 11 unpub. op. at 9.

**II**

**A**

33. RCM 1210(f)(2) stipulates:

(2) *Newly discovered evidence.* A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of other pertinent evidence, would probably produce a substantially more favorable result for the accused.

In connection with applying this standard in this appeal, several points should be made at the outset.

■■■ 34. First, the determination whether sufficient grounds exist under RCM 1210(f)(2) for ordering a new trial rests with the authority considering the petition. *United States v. Bacon*, 12 MJ 489, 492 (CMA 1982); *accord United States v. Cosner*, 35 MJ 278, 281 (CMA 1992). Since appellant's petition was filed while the appeal from her court-martial conviction was pending before the Court of Military Review, that tribunal was the appropriate authority to consider the petition for new trial. Art. 73.

35. Second, a petition for new trial may rest upon newly discovered evidence that would "substantially impeach[ ]" critical prosecution evidence "on a material matter." *United States v. Williams*, 37 MJ 352, 354 (CMA 1993).

36. Third, in making its decision, the "authority considering the petition may cause such additional investigation to be made and such additional information to be secured as that authority believes appropriate." RCM 1210(g)(1). In *United States v. Giambra*, 33 MJ 331, 335 (1991), this Court determined that a *DuBay* (¶ 17) factfinding hearing may be an appropriate vehicle for this purpose.

■ 37. Fourth, "[t]he evidence which serves as the basis for such a motion [for new trial] may be judged by the reviewing body both in terms 'of credibility as well as of materiality.' ..." Thus, when a petition for new trial is pending before a Court of Military Review, that court has "the 'prerogative' of weighing 'testimony at trial against the' post-trial evidence 'to determine which is credible.' ..." *United States v. Bacon*, 12 MJ at 492, *quoting United States v. Brozauskis*, 46 CMR 743, 751 (NCMR 1972). Indeed, this "'prerogative'" would seem even to be a responsibility, in light of the burden that is on the petitioner to demon-

strate that the newly discovered evidence "*would probably produce* a substantially more favorable result...." RCM 1210(f)(2)(C). If proffered newly discovered evidence patently is full of holes when considered in light of the record of trial, petitioner would not have carried her burden; and it would be absurd to hold the reviewing authority slave to the facial, though farcical, so-called "dispute" in the evidence. *See generally United States v. Giambra*, 38 MJ 240, 241 (CMA 1993)(petition for new trial based on recanted testimony); *United States v. Van Tassel*, 38 MJ 91, 96 (CMA 1993)(petition for new trial based on newly discovered evidence regarding mental responsibility).

■ 38. Fifth, the decision whether to grant the new trial will be reviewed only for abuse of discretion. *United States v. Williams*, 37 MJ at 356; *United States v. Bacon*, 12 MJ at 492. Concerning this standard of review, this Court indicated in *United States v. Williams*, *supra* at 356:

Legal error (*i.e.*, an abuse of discretion) occurs if the findings of fact upon which he [the authority who considers the new-trial petition] predicates his ruling are not supported by evidence of record; if incorrect legal principles were used by him in deciding this motion; or if his application of the correct legal principles to the facts of a particular case is clearly unreasonable.

■ 39. On this record, we have tested for an abuse of discretion in the Court of Military Review's denial of appellant's petition for new trial. Whether one pigeonholes our concern into the first or the third of the above-quoted possibilities, or indeed whether our view is a hybrid of sorts, our conclusion is inevitable. As Judge Cox put it in writing for a majority of this Court in *United States v. Singleton*, 41 MJ 200, 207 (1994):

[W]e cannot conclude, in a due process sense, that appellant has yet enjoyed a full and complete trial. Far too much of the information that needed to be evaluated by a factfinder in order to assess appellant's culpability, was not. We conclude that the military judge [or, here, the Court of Military Review] abused [its] discretion in con-

cluding that the evidence probably would not produce a substantially more favorable result.

Cf. *United States v. Chadd*, 13 USCMA 438, 32 CMR 438 (1963)(justice done only with full knowledge of all the facts).

B

40. As was the situation in *Singleton*, "this was a trial that came down to a single question: Who did the members believe. . . ." 41 MJ at 204–05. The prosecution's evidence consisted of a low-level positive urinalysis and Capt Sztuka's sworn pretrial statement to the OSI that he had smelled marijuana on appellant's person and had seen it in her house. Contrariwise, appellant—an officer of good and long service—forthrightly denied knowingly using marijuana and, instead, offered a plausible scenario of her estranged husband surreptitiously spiking her Cajun gumbo with this contraband herb.

41. If Capt Sztuka is believed, his statement and the positive urinalysis seal appellant's doom; if appellant is believed, neither item of prosecution evidence can support a conviction (the usually inferred capability of the positive urinalysis to prove knowing ingestion thereby being equally undermined). As Judge Cox wrote in *Singleton*: "Against this backdrop, these are the items of evidence *not* before the members for consideration" (41 MJ at 205):

42. *First.* Lt Guest's testimony that, on two occasions during which Capt Sztuka was drunk and overwrought, he told her that he had " 'slammed' " appellant by " 'put[ting] dope in her food.' "

43. *Second.* Ms. Lieblong's testimony that Lt Guest had told her of Capt Sztuka's first admission the day after he had made it, in December 1991; thus, this testimony was evidence of a prior consistent statement by Lt Guest that would rebut a suggestion that she had fabricated her story to get back at Capt Sztuka for dumping her in the spring of 1992, *see* Mil.R.Evid. 801(d)(1)(B); *Tome v. United States*, — U.S. —, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995); *United States v. McCaskey, supra.* ¶ 21.

44. *Third.* Capt Sztuka's testimony which, while substantively adverse to appellant, does much to cast him as slippery and as difficult to get hold of. His evasiveness, coyness, and equivocation as a live witness would add considerable dimension to the picture offered a factfinder over the terse and cold pretrial statement admitted in its stead at appellant's court-martial. Indeed, Capt Sztuka may have best characterized himself in the taped conversation with appellant when he seemed proudly to proclaim: "I'm a sly little sneaky shit."

45. *Fourth.* The transcript of that taped conversation would seem to shine further light on Capt Sztuka's character in two ways. First, the defense could be expected to contend that the transcript itself reveals a scheming, manipulative character; and second, substantively it seems to be inconsistent with his *DuBay* testimony in certain important respects. For instance, the transcript suggests, contrary to his *DuBay* testimony, that the subject of someone testifying at appellant's court-martial to having put marijuana in her food originated with Capt Sztuka, whereas he insisted at the hearing that appellant had initiated all the ideas. Also, he emphatically swore at the hearing that he had told appellant why that "would not be a good idea," whereas the transcript shows him to be eager and enthusiastic about the possibility. We recognize that this conversation was not newly discovered evidence; however, the newly discovered evidence of Lt Guest's and Ms. Lieblong's testimony gives this tape new meaning and importance, as appellant's original defense counsel testified at the *DuBay* hearing. Further, Capt Sztuka's waffling as to whether it was he on the tape and, if so, whether the tape was accurate is "newly discovered," since he was not an available witness at the court-martial.

C

46. We are aware, of course, that the military judge and the Court of Military Review made certain findings as to the credibility of Lt Guest and Capt Sztuka that might tend to cut against the importance that these items of evidence would have at a court-

martial. While we acknowledge those findings and do not reject them as unfounded in the record, at the same time they must be tempered by what we believe are certain flaws in the reasoning that led to them.

47. The judge found Lt Guest not to be a credible witness, and concededly there were factors to support that conclusion. At the same time, however, the military judge too quickly minimized the "two other items of evidence" that he recognized "tend to possibly lend some credibility to her testimony— (1) the testimony of Joy L. Lieblong and (2) the clandestine pre-trial tape recording of a conversation between the accused and Capt Jan Sztuka." ¶ 28(6).

48. As to the tape, he dismissed it as being susceptible "to several interpretations," some corroborative of Lt Guest and others not. ¶ 28(7). That is a fair description of the tape regarding the ultimate question whether Capt Sztuka planted the marijuana in appellant's food, but it wholly misses the value of the transcript for the purposes described earlier in this opinion—that is, as showing Capt Sztuka as the kind of person who might be fully capable of doing what Lt Guest testified that he admitted doing.

49. As to Ms. Lieblong's testimony, the military judge appropriately recognized that it "does tend to lend some credibility to Rebecca Guest as a witness," but he then greatly qualified its corroborative force by noting that it "relates back to Rebecca Guest herself as a source." ¶ 28(7). This reasoning indicates, again, that the military judge missed the value of this evidence. Its worth did not lie in the substantive truth of what Ms. Lieblong had to say; if that were so, then the military judge's denigration of it as having originated with Guest would be appropriate. Its real worth, however, was to show that Lt Guest had made the same claim about Capt Sztuka's admission in December 1991 as she did in August 1992, long before she arguably had a motive to fabricate this admission after being jilted by Capt Sztuka in the spring of 1992. Thus, in a very direct way, Ms. Lieblong's testimony added to Lt Guest's credibility by frontally rebutting the argument that she had made it all up to get

back at Capt Sztuka. Ironically, then, Lt Guest being the source of Ms. Lieblong's testimony is what gives that testimony its real value.

50. On the other side of the coin, the military judge found Capt Sztuka credible. More precisely, the military judge—after expressly noting that the captain's "career ... since the trial has not struck a note tending to support his credibility"—nonetheless said that he could "find no basis to reject that testimony out of hand." ¶ 28(8). This seems to indicate that the military judge viewed Capt Szuka's testimony with a presumption of credibility and could find no smoking gun upon which to conclude otherwise—a far different approach from the one he took toward evaluating the testimony of the other critical *DuBay* witness who had not testified at appellant's court-martial, Lt Guest.

51. Similar flaws can be found in the rationale of the Court of Military Review. As to Lt Guest's credibility, the court pointed to her motive to fabricate her story, yet made no mention at all of the lieutenant's prior consistent statement, made before her motive to fabricate would have arisen, that appeared via the testimony of Ms. Lieblong. The Court's evaluation of the taped conversation generally was the same as the military judge's view and, thus, was equally problematic.

52. As to Capt Sztuka's testimony which the court found "quite plausible," the opinion quotes favorably from that testimony while not acknowledging inconsistent (even contrary) statements in the transcript of the taped conversation. In dismissing appellant's argument "that she should receive a new trial so she may cross-examine Capt Sztuka," the court opined that the captain's nonjudicial punishment (Art. 15) for drunk driving "and the apparent difficulties in his personal life, do not give us reason to conclude that he lied under oath." ¶ 31. Maybe so, but the court made no mention at all of what we have noted as the great vulnerability of a live Capt Sztuka on the witness stand—a vulnerability that was bared by the civilian defense counsel at the *DuBay* (¶ 17) pro-

ceeding and doubtless would be exposed again at a new trial. *See* RCM 810 and 1210(h). This presents a marked contrast to appellant's inability at her court-martial to test either Capt Sztuka's story or his personal credibility due to his invocation of his privilege as her spouse not to testify.

D

53. In sum, it is our conviction that the landscape upon which a new trial would play would be vastly different from the set of the original court-martial.[3] So much so that we believe that the court below abused its discretion when it held that the new evidence would probably not produce a substantially more favorable result for appellant. *See* RCM 1210(f)(2). As the military judge noted, this case has become a "judicial afternoon soap opera." ¶3. Like all soap operas, this one has at least one more installment to play out.

III

The decision of the United States Air Force Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A new trial may be ordered.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

APPENDIX

Selected Portions of Testimony of Captain Jan Sztuka at Appellant's *DuBay* hearing

Q (by trial counsel). Now have you ever told Rebecca Guest that you placed marijuana in Major Linda Taylor [Sztuka]'s food?

A. As I said in that statement, sir, I can recall no time I would even joke about that. I have no recollection of anything like that.

\* \* \*

Q. Did you ever tell her that you put dope in her food?

A. No, sir.

Q. What about her gumbo?

A. No, sir, I have never done that, to the best of my recollection.

\* \* \*

Q. Did the subject of gumbo ever come up between you and Ms. Guest during your relationship?

A. I did, on one occasion at least that I remember, mention the fact that this was the purported vehicle for the controlled substance getting into Major Taylor. I remember that being mentioned as part of the court-martial and her defense.

Q. What was Ms. Guest's reaction to that?

A. Incredulous. It was laughable, humorous, how could she ever come up with something so stupid. That kind of response.

Q. Wasn't it true that at this court-martial case, at least in your mind and Ms. Guest's mind, had become referred to as the gumbo case?

A. Yes, sir, that is correct. I believe the actual term that was used was the great Cajun gumbo caper.

\* \* \*

Questions by civilian defense counsel:

Q. Good afternoon, Captain. I made some notes as you were testifying and you said, both in your statement to OSI and on the stand here, because I wrote it down that to the best of your recollection, you didn't tell Rebecca Guest, even in jest, that

---

**3.** In this appeal, we have not jousted with the correctness of the military judge's ruling that admitted Capt Sztuka's out-of-court statement as trustworthy hearsay from an unavailable witness, *see* Mil.R.Evid. 804(b)(5), Manual for Courts-Martial, United States, 1984—a ruling that would seem arguable in light of the circumstances surrounding the state of the marriage, the timing of Capt Sztuka's making the statement and blowing the whistle on his wife, and his invocation of the spousal-incapacity privilege of Mil.R.Evid. 504(a) with the result of shielding himself from predictable defense attacks. Needless to say, however, if that ruling was incorrect, the contrast is even more stark.

you put dope in your ex-wife's food. Is that what you said?

A. Yes, sir.

Q. Does that mean that you may have said it in jest?

A. To the best of my recollection, I said it in no way whatsoever, not even in jest.

Q. And I noticed you said something else, to the best of your knowledge. Those are sometimes interpreted as lawyers' phrases and I want to cut to the chase. Now are you telling the Judge under oath that you didn't say those words or that you didn't say those words as near as you can remember? I want to know if you are qualifying your denial.

A. I am saying to the best of my knowledge at this time, being a year plus later, I didn't say them in jest or otherwise.

Q. Did you ever suggest to your ex-wife that she should, with your help, put on a witness who would say that marijuana had been put in her food?

A. I don't remember the conversation as it was relayed to me.

Q. Well, let me ask you, to the best of your recollection, did you ever suggest to your ex-wife that you could get somebody to come forward and say that they put marijuana in her food?

A. I don't recall the particulars of the conversation. She asked me to do a lot of things for her. We did talk about it.

Q. When you say, "We did talk about it", we did talk about what?

A. She asked me to come forward and say that either I put it in her food or somebody put it in her food all along and I tried to reason with her and tell her how that would be a stupid thing for me to do or for her to do.

Q. And, Captain, are you telling the Military Judge here under oath, to the best of your recollection, you did not suggest that to your ex-wife?

A. No, sir, the best I can remember that was her suggestion to me.

Q. All right, sir. Have you seen this transcript we prepared and provided the government of the taped conversation be-tween your ex-wife and you on 28 May 1991?

A. Yes, sir, I have seen it.

CIV DC: Your Honor, we would like to present this as Appellate Exhibit XXXII.

MJ: Okay.

CIV DC: I am handing a copy to the Military Judge. Captain, you've had a chance to review that particular transcript, have you not, sir?

WIT: Yes, sir, I have.

Q. It is true, is it not, in that transcript that you are the one who is describing to your ex-wife how easy it would be to fool the Air Force into thinking that somebody put marijuana in her food?

A. The transcript does indicate that.

Q. Well, is that what you said?

A. Well, I listened to the tape.

Q. Yeah?

A. And it was of such poor quality that I don't know what came before or after the portion that I heard. I couldn't even determine it was me.

Q. I gave the entire tape to the government. Did you listen to the entire tape?

A. I listened to the tape that was provided to me. From that tape, I can't match what was said to this transcript. The tape was of such a terrible quality, I can catch a word here and there. The person who was speaking, I can't match the voice, the inflection, the resonance, to me and neither could any—well, not any—but one of my friends.

Q. Did that mean some of your friends could and some couldn't?

A. No, I only had one person listen to it and that person was speculative as if it was even me and I am too. I can't prove that it was me. If it was me, I said it, but I don't know. I can't say.

Q. Well, Captain, again, I don't want to get into lawyer phrases. Are you telling this Military Judge under oath that that is not your voice on the tape?

A. I'm telling him what I just—

TC: Objection, Your Honor. We are approaching badgering the witness. He has answered the question.

MJ: I don't think so, not yet. The witness may answer. Go ahead.

WIT: I will tell you what I just told you. I can't tell you it is my voice on the tape. If it is my voice, I said it. But I can't tell you that it is.

CIV DC: Your Honor. I propose to play the tape. I will concede that it is not great quality, but the voices come through, I think, fairly clearly.

MJ: Very well. If that can resolve this dilemma, we can go ahead. I really don't think the government has any serious issue, do you, that this would be a conversation between the Sztukas?

TC: Your Honor, again, we were provided the tape. The source of this tape, the individual who prepared the transcript remains a deep, dark mystery.

MJ: Okay, I am in here to look for the truth and not to play little games. So let's hear the tape.

CIV DC: All right, sir....

(The tape was played and the transcript is found at Appellate Exhibit XXXII.)

\* \* \*

CIV DC: Captain, is it your testimony that is not your voice on the tape?

WIT: In some places, it sounds like me, and in some places, it doesn't. I—

Q. Are you—go ahead, I'm sorry.

A. I don't recall all of that conversation. I recall conversations of that nature having taken place. But there are some peculiar breaks I can't account for and I don't recall. So if it is me, then I said it.

Q. You told your ex-wife on the tape that it was kind of exciting to beat the law at its own game?

A. Again, I can't say that was me saying it.

Q. Well, was that your feeling at the time, that it was kind of exciting to try and beat the law at its own game?

A. I can't tell you. I had a lot of feelings at that time.

Q. Was that one of them, Captain?

A. I don't recall. I would doubt it. I'm not that type of individual, but I don't recall.

\* \* \*

Q. Did you discuss the possibility of telling a military court that somebody put marijuana in your wife's food with her, whether on that conversation or some other conversation?

WIT: I would like to speak with my defense counsel at this point, if I could. I don't understand really where you are going or what you are doing.

CIV DC: I will let you. I can wait, Your Honor.

MJ: Okay, go ahead. Let's make it expeditiously, though.

\* \* \*

MJ: The witness has again resumed his seat on the stand. I will do this every time there is an interruption. I will remind the witness he is still under oath. Please continue if you have further questions.

CIV DC: Thank you, Your Honor. Captain Sztuka, now that you have had a chance to confer with counsel, let me put to you this question again. Did you discuss with your ex-wife at any time the possibility of telling a military court that somebody put marijuana in her food?

WIT: Sir, we had a lot of discussions at that point in time and basically she was pinging. She was trying to come up with anything she could to free herself of this burden that was placed on her shoulders as she felt.

Q. Is it your—

A. There is a possibility that we could have discussed numerous things and I told her why they wouldn't work.

Q. Did you discuss with her the possibility of telling a military court-martial that somebody put pot in her food?

A. I answered that question in my mind. I said I think we discussed all of those different type things, everything, any option she came up with, we discussed.

Q. Captain, I want you to answer my question about—

TC: Your Honor, I'm going to object. The question has been asked twice and we have received an answer.

MJ: Okay, I will allow the question one more time. Go ahead, please.

CIV DC: Captain, specifically, did you discuss with your ex-wife going into court and telling the military court-martial that somebody put pot in your food, yes or no?

WIT: We discussed that option, along with others, and I told her why it would not be a good idea.

Q. Now, would you agree with me that, if this is you on the tape, you weren't telling her that it wasn't a good idea on the tape, you were telling her it was an exciting idea, weren't you?

A. If that's me on the tape, whatever the tape suggests and again, I said I don't know if it is me or not. But if it is, I said that. But like I said, we talked about a lot of things at that time.

Q. Can you tell me any reason why you would tell her it was an exciting thing and have it in your mind that you were telling her what a bad idea it was? That is kind of conflicting, is it not?

A. Again, I can't confirm it was me. So, no, I can't think of why I would tell her.

Q. Thank you. Now isn't it true, Captain, that you came up with the idea of having someone else come forward to extricate your ex-wife by saying that they put pot in her food because, in fact, you thought of that because you did that to her?

A. I did nothing to her. And I was not the one who initiated ideas. She asked me to do it.

Q. And you would agree with me that, if that is your voice on the tape, it is you initiating it, isn't it?

A. If that's my voice on the tape, then I said what's on the tape.

Q. Now, the day after your wife was convicted and dismissed from the Air Force, did you attempt to kill yourself?

A. No.

Q. Did you have an episode in which police and military personnel were called to your home?

A. Yes.

Q. And would you describe that incident as an incident in which you were highly intoxicated?

A. Intoxicated.

Q. And in possession of a firearm?

A. Yes.

\* \* \*

Q. Do you have a drinking problem?

A. No.

Q. Had you ever had a problem with alcohol?

A. No.

Q. Did you appear in this courtroom during your wife's trial after drinking?

A. I probably had a few drinks the night before.

Q. Are you aware that the Staff Judge Advocate thought you were drinking that morning?

A. I read his letter. That is totally untrue.

Q. Captain, did you talk with someone in Atlanta, Georgia, the night the police were dispatched to your house and tell them you were thinking of killing yourself?

A. I don't remember what the conversation entailed.

Q. What was the conversation about?

A. I don't remember.

Q. Who were you talking to?

A. Uh—one of two friends, the guys that we were getting ready to have our ten-year reunion at the Air Force Academy.

\* \* \*

Q. Can you give the court any good reason why they would call the police and say that you just said you were going to kill yourself?

A. They were worried about me. I was in a distraught state.

Q. Did you tell them you were going to kill yourself?

A. I don't recall ever making such statement.

Q. To the best of your knowledge?

A. Yes.

Q. Could have?

A. I don't recall. I doubt it.

CIV DC: Your Honor. I would like to offer as Appellate Exhibit XXXII or is this XXXIII?

MJ: Appellate Exhibit XXXIV.

CIV DC: It's the Jacksonville Police offense report, supplemental report.

\* \* \*

CIV DC: Captain Sztuka, did I understand you to say that you did, during your relationship with Ms. Guest, mention to her, and I wrote down how you said this, you mentioned to her, that gumbo was the method that was suggested as to how the marijuana got into Major Taylor?

WIT: Yes, sir, that's correct.

Q. So you and Ms. Guest talked about marijuana in the gumbo?

A. That's correct.

\* \* \*

CIV DC: I am showing XXXVIII to the Military Judge.

MJ: Very well.

CIV DC: Now, let me show you Exhibit XXXV, which is what I was showing you when we took the break. Is this document on both sides in your handwriting?

WIT: Yes, it is. Well—

CIV DC: Go ahead. Were you going to say something?

WIT: Yeah, that appears to be.

Q. Now on one side it starts out with the word "Koz" as a salutation in a letter. Was it meant to be a letter?

A. Yes, sir.

Q. Captain, do you write out what you are going to say to people from time to time and practice it before you say things to them?

A. I take notes from time to time when talking to people on the telephone, in person or whatever.

Q. For instance—

A. Like—

Q. Go ahead.

A. Like memory joggers, type thing.

Q. For instance, can we agree that you wrote out notes about exactly what you were going to say at the OSI before you went and turned your wife in to the OSI? You wrote some notes about what you were going to tell them?

A. I don't recall ever doing that. I probably wrote notes to myself reminding me of certain things, but I don't recall writing a specific agenda that I needed to discuss with anybody and what to tell them.

Q. Now that letter is to somebody named Koz. Would you identify the party known as Koz?

A. Yeah, it is Captain Kosewicz. He was someone that worked with my ex-wife at the Recruiting Squadron here on base.

Q. And did you threaten him?

A. No, sir, I did not.

Q. And is that a letter that you sent to him?

A. That's a letter I—I think I laid it on his desk or somehow or other I got it to him.

MJ: Captain who?

WIT: Captain Kosewicz, Your Honor.

CIV DC: It's a witness at Keesler, Your Honor.

MJ: I see.

CIV DC: And did you have conversations with Captain Kosewicz about your ex-wife and things you were going to do to her?

WIT: I don't know if I understand.

Q. Did you have conversations with Captain Kosewicz about Ms. Taylor and things you were going to do to her or have done to her?

A. I don't recall any such conversations. He always wanted to stay out of it and I let him do that.

Q. Now you wrote him a letter there and if you will pardon the vernacular, you said you wanted him to get the fuck out of your life, correct?

A. That is correct.

Q. And on the back, there are notes that say "get her to keep her mouth shut about me." Who were you referring to?

A. I have no idea. That's just something somebody said to me. I assumed it was cute. I wrote it down.

Q. Well, who were you referring to, who was it you were going to "get her to keep her mouth shut about me"? Who is her?

A. I don't know. I don't remember. I don't recall.

Q. What about the next reference, "load up and shoot her with both barrels"? Who is her?

A. I don't know. I don't recall.

Q. Below that there is a phone number for the OSI, is that right?

A. Uh—I don't know. It says OSI call at 10:36 a.m. I don't know what that phone number is off the top of my head.

\* \* \*

Q. Captain, let's take the bottom half of the letter and compare it to the top half of the letter. Do you think the reference to shooting her with both barrels, the "her" might be your ex-wife?

A. You can speculate as well as I can, but I don't recall what the context was of that.

Q. You wrote it, right?

A. I wrote it.

Q. Are you telling this Military Judge under oath that that doesn't refer to your ex-wife, is that what you are telling him?

TC: Your Honor, I believe that question has been asked multiple times. We are badgering this witness. We object.

CIV DC: Your Honor, this witness is being coy with me and I just want him to give me a direct answer?

MJ: Ask it one more time and get one more answer and then let's move on.

CIV DC: Are you telling the Judge—

TC: Your Honor—

MJ: Just a moment—

TC: —could the counsel avoid pointing at the witness?

MJ: Come on, Major Keller, I don't believe that is any form of badgering any more than perhaps an objection on that basis. He is also standing darned near across the courtroom from him. But to save us a little time, Mr. Welch, perhaps don't point at the witness.

CIV DC: My hands are in my pocket, Your Honor. Captain, are you afraid of me?

WIT: No, sir.

Q. Am I intimidating you?

A. Not in the least.

Q. Good. Now that we understand that, are you telling this Judge under oath that you don't know whether that refers to your ex-wife on that letter?

A. I'm telling the Judge under oath the same thing I'm telling you, sir. I don't recall.

\* \* \*

CIV DC: ... Captain Sztuka, you received an Article 15 for driving while intoxicated, did you not, sir?

WIT: Yes, I did.

Q. That was on 29 February 1992?

A. That's correct.

\* \* \*

Q. Had you told Ms. Guest that you had your ex-wife hammered?

A. I don't recognize that terminology.

Q. Did you tell her that you had her turned into toast?

A. I may have used the word "toast", yeah, but I don't—

Q. As a cute little remark?

A. I don't know in what context.

CRAWFORD, Judge (dissenting):

54. Coherence is the essence of insuring a rational judicial process. Without any explanation, the majority rejects the findings of fact by the judge and the court below, and casts aside the standard of review enunciated and followed by this Court for years. *See, e.g., United States v. Burris,* 21 MJ 140 (CMA 1985). In fact, the majority completely disregards the evidence surrounding the search of appellant's quarters as well as the events leading up to that search as if that evidence is unrelated to the petition for new trial.

55. It defies reason why the majority, in 27 typed pages with a lengthy appendix, does not address why the judge's or Court of Military

Review's factual findings are clearly erroneous; does not address the question of the search even though the issue would clearly be relevant; does not explain that the low nanogram level would not be unusual based on the fact that appellant, a nurse-recruiter, had used a medical solution in a rubber bag with a tube and stopper to flush her bladder (¶ 63); does not mention how appellant delayed the search of her house to preclude finding any residue; and does not reveal or consider that, prior to trial, appellant asked her husband to recant his statements.

## FACTS

56. Appellant met Captain Jan Sztuka in April 1988. She was a nurse-recruiter in Arkansas while Capt Sztuka, a graduate of the Air Force Academy, was a pilot at Little Rock Air Force Base, Arkansas. They continued to date each other for approximately 2 years. He lived at 9 Del Tara Drive, and she lived 3 houses away at 15 Del Tara Drive. After they were married on October 12, 1990, Capt Sztuka was deployed to the Middle East in support of Desert Shield/Desert Storm operations. He returned for approximately 5 weeks during December 1990 and January 1991. He then left to participate in the air war (January 16 through February 23, 1991) and the ground war (February 23–27, 1991), and returned to a welcome-home party thrown by appellant on March 5, 1991. On March 8, 1991, as well as on other evenings upon his return home, he stayed at appellant's residence. In fact, he kept his uniform, boots, and many personal items at her house. But he did not have a key to her premises after his return on March 5, 1991.

57. On Saturday, March 9, 1991, Capt Sztuka says he smelled marijuana on the accused's person and observed a small marijuana baggy in the bathroom. He confronted appellant. She admitted drug abuse but said she would immediately stop using marijuana and flushed the marijuana down the toilet. However, he previously observed marijuana in a ceramic frog and Band Aid box in the bathroom.

58. Because he was upset, according to Capt Sztuka, and wanted his wife to stop using drugs, he approached Capt John G. Long, Chief of the Mental Health Clinic at the Little Rock AFB Hospital. Capt Long, however, referred Capt Sztuka to the local Air Force Office of Special Investigations (OSI). Capt Long in turn contacted the local OSI office and briefed them on the matter.

59. At approximately 1730 hours on March 9, 1991, OSI Special Agent Patrick A. Ahlgrimm called Capt Sztuka. Capt Sztuka agreed to discuss the case at his residence. He told Agent Ahlgrimm about the smell of marijuana on appellant's person, that he confronted her about her marijuana use, and that this resulted in her telling him to get out of the house. He also told the agent that he had informed his wife that he had notified the commander. He reported that appellant became angry at this and started to cry.

60. Following this interview, both Agent Ahlgrimm and Capt Sztuka traveled to the local OSI office where Capt Sztuka made a written statement under oath. The agent attempted to get advice on a search authorization from the staff judge advocate (SJA), Lieutenant Colonel (LtCol) Robert E. Kaszczuk, but was unable to locate him. He then contacted a local judge and asked about obtaining a search warrant. However, Agent Ahlgrimm was worried about a 48–hour delay over the weekend to obtain a warrant even though the judge concluded that, based on the information provided, there was probable cause. Since Capt Sztuka consented to a search of both residences, no search warrant was obtained. He also agreed to give a urine sample.

61. However, prior to going to the residences, Agent Ahlgrimm contacted LtCol Donald J. Green, the Acting Base Commander, to obtain his authorization to obtain a urine sample from appellant. After discussing the information with the SJA, LtCol Green determined there was probable cause for an authorization to compel a urine sample.

62. At approximately 2145 hours, Agents Ahlgrimm, Freeman, and Franklin, as well as Detective Kenny Boyd of the Jacksonville Police Department, met outside 15 Del Tara Drive. Detective Boyd knocked on the door,

identified himself, and announced that they were authorized to search. Appellant came to the door wearing a blue robe and night gown, but said she needed a few more minutes. After waiting approximately 2 to 3 minutes, appellant then opened the door.

63. A search of the premises commenced and lasted approximately 1 hour but did not reveal the ceramic frog or Band Aid box. However, during the search, they found a bag containing a liquid with a rubber tube and a stopper. While the agents were searching the house, Agent Franklin stayed with appellant and noticed that she had a 5-inch diameter wet spot on her pants. Franklin asked for an explanation and appellant gave two: first, that the bathtub was stopped up and apparently overflowed, and her pants got wet around her crotch area; or second, that she had her period. The agent then directed appellant to submit to a urine sample. She resisted giving a sample at night because her young child was asleep. After appellant refused to go to the hospital, the agents called LtCol Green who talked with appellant on the telephone. He ordered her to give a urine sample that evening.

64. Eventually they went to the hospital. At the hospital Agent Franklin and Airman First Class Kenyon Vandervelde noticed that appellant had in her hand a brown plastic top to a ball point pen cap which she held near her groin area. The agents removed the pen cap. After a short wait, appellant gave a urine sample that tested positive for marijuana use. Agent Franklin, who was personally observing the giving of the urine sample, noticed that appellant did not remove a sanitary napkin or tampon, thus undermining one of appellant's explanations for the wet spot. The nanogram level was just about at the cutoff level. The nanogram level in Department of Defense Directives for a positive urinalysis is artificially high to ensure there are no false positives. *United States v. Arguello*, 29 MJ 198, 204 (CMA 1989). Additionally, appellant's nanogram level would have been lowered due to her flushing of her bladder which dilutes the urine in the bladder.

65. Prior to trial on May 28, 1991, appellant called her husband to work out a defense for the upcoming trial. During this conversation, which was taped by appellant, they sought to devise a defense. However, the transcribed tape recording could be read, as the Court of Military Review opined, as appellant's trying to obstruct justice and suborn perjury. It is notable that, although the taped conversation was made by the defense, the tape itself does not appear in the record, and only a partial transcription was made by the defense.

66. At appellant's request a post-trial hearing was held as to whether the appellant's motion for a new trial should be granted. The military judge found, in part, as follows:

[ (5) ] [E]valuating ... testimony ... is a task which is most difficult in this case. We are faced with a trial more than two years ago. We are faced with a case which has developed an appellate life of its own. Sadly, it has taken on some aspects of a judicial afternoon soap opera.

[ (6) ] I cannot find sufficient credibility from the testimony of Rebecca Guest to justify its elevation to the level of newly discovered evidence which if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused. I cannot find Rebecca Guest to be a credible witness. Interesting but not credible is, in my opinion, a fair description of that witness' testimony. Only two other items of evidence tend to possibly lend credibility to her testimony— (1) the testimony of Joy S. Lieblong and (2) the clandestine pre-trial tape recording of a conversation between the accused and Capt Jan Sztuka.

[ (7) ] In my opinion, the taped conversation can be subject to several interpretations inconsistent with corroborating the testimony of Guest, just as easily as it can be used to lend credibility to that post-trial testimony. Additionally, although the testimony of Joy S. Lieblong does tend to lend some credibility to Rebecca Guest as a witness, that testimony also relates back to Rebecca Guest herself as a source. *I*

*find that it does not lend sufficient credibility to her testimony in view of the dollops of other evidence tending to adversely reflect on her credibility.*

[ (8) ] Rebecca Guest's testimony also must be viewed in the context of Capt Jan Sztuka's clear testimony to the contrary. Although the career of this Air Force Officer since the trial has not struck a note tending to support his credibility, I can find no basis to reject that testimony out of hand . . . .

(Emphasis added.)

67. The Court of Military Review likewise found that Lt Guest and appellant lacked credibility. Aug. 11 unpub. op. at 7. They recognized both were spurned lovers. Agent Evans and Agent Ahlgrimm testified that "Lt Guest 'was excited' at the prospect of Capt Jan Sztuka being punished." During an initial interview with Lt Guest, she "said nothing about Capt Sztuka" putting marijuana in appellant's food. *Id.* at 3. It was only later that she made that assertion. The agents also noted that "Lt Guest grew agitated and angry as she spoke, especially when relating the fact that Capt Sztuka was dating another woman." In addition to her motive to fabricate being clearly established by the record, the OSI investigators were emphatic in their testimony that she never mentioned anything about Capt Sztuka's admitting that he had put marijuana in appellant's food as Lt Guest claimed. *Id.* at 4. The assertion that they testified because they had been "hoodwinked by Capt Sztuka" was "refuted fully by their actions . . . ." *Id.* at 7.

68. In addition to these findings, the Court of Military Review found as follows:

We find the military judge's findings and conclusions fully supported by the record. We, as did the military judge, simply find Lt Guest unworthy of belief. . . . During his questioning of the agents, petitioner's counsel suggested they were hostile to Lt Guest because her claim suggested dereliction on their part in being "hoodwinked by Capt Sztuka." This assertion is refuted fully by their actions on the information she did provide.

When Lt Guest alleged Capt Sztuka held himself out as a "gun for hire," the investigators promptly targeted her against him and attempted to validate the allegation, including listening on telephone extensions, with Lt Guest's consent, while she engaged Capt Sztuka in conversation—all to no avail. In fact, SA Evans testified that during these conversations, Capt Sztuka did not desire to talk with Lt Guest. SA Evans stated they took a written statement from her to close the file, and she made no mention of petitioner's case therein. There is nothing in the record to indicate the investigators would have been any less interested in the marijuana allegation than they were in the "gun for hire." In fact, human experience would indicate just the opposite reaction: if Capt Sztuka had deceived them, that would be maximum incentive to develop a solid case against him.

With regards to the "transcript" of the taped conversation between petitioner and Capt Sztuka prior to her trial, to say it is subject to interpretation is to place it in its most favorable light. This conversation was alluded to during petitioner's testimony at her trial, but the "transcript," although it existed, was not offered as evidence. During her cross-examination, petitioner claimed she entreated Capt Sztuka to admit he caused her positive urinalysis, but he twisted it to make her appear she suggested he perjure himself. She denied the reason for the abrupt termination of the conversation was his discovery she was recording it surreptitiously.

Our impression of the "transcript" is that it raised the spectre of two people seriously discussing various ways of how false testimony might be presented to a court-martial. We discern little evidence of petitioner attempting to persuade Capt Sztuka to come forth with the truth and correct an injustice. Further, there is no clear claim or accusation in petitioner's January 1992 letter to Lt Guest that Capt Sztuka spiked her food. Petitioner expressed her bitterness towards Capt Sztuka for being the source of her troubles, but she did not attribute his having spiked her

food as the reason. His simply reporting her drug involvement, as he did, is just as likely a source for her bitterness.

Finally, we find Capt Sztuka's testimony quite plausible. Confirming conversations occurred regarding petitioner's claim that he spiked her food is a vastly different matter than admitting it. The same rationale applies to the "gun for hire." He testified that, during their cohabitation together, he shared with Lt Guest that while on a hunting trip in Arkansas, another member of the party alluded to having people eliminated for $500.00. Capt Sztuka testified he related the story to Lt Guest as another example of Arkansas eccentricities. He never claimed the personal ability to make such arrangements. He testified the taped conversation with petitioner prior to her trial occurred as a result of her asking him to either say he put marijuana in her food or that someone else did.

Aug. 11 unpub. op. at 7–8.

## DISCUSSION

69. This is the first case of which I am aware that this Court has not applied the rule of accepting the findings of fact below unless they are clearly erroneous. *See, e.g., United States v. Burris,* 21 MJ 140 (CMA 1985). In effect, the majority has chosen to retell this story using illusive factfinding authority. *See* Art. 67(c), Uniform Code of Military Justice, 10 USC § 867(c) (1989).

70. Although the majority analyzes the petition for new trial under a legal abuse-of-discretion standard, it fails to enunciate where there was any abuse. "Whether one pigeonholes our concern into the first or third ... possibilities, or indeed whether our view is a hybrid of sorts, our conclusion is inevitable." ¶ 39. This conclusion appears to be a failure to follow RCM 1210(f)(2), Manual for Courts–Martial, United States, 1984, but then I am not surprised at the inevitability of the majority's conclusion based on their rendition of the "facts."

71. There are two issues in this case. The first is the question of the search of appellant's quarters, and the second is the

petition for new trial. While the majority would ignore the search issue, these are interrelated. The evidence surrounding the search undercuts appellant's credibility concerning allegations that the spiteful husband spiked her gumbo.

72. Additionally, a second matter tends to totally undercut appellant's defense. There are a number of well-known studies which have shown that the psychoactive ingredient in marijuana is not free standing. Unlike such substances as cocaine or heroin, leaf marijuana must be heated to a temperature of at least 300° F to release the cannabinoids in the plant. *See* R. Willette, *Oral Ingestion of Cannabis Products* (Dec 1987) (unpublished manuscript), quoted in Fitzkee, *Prosecuting a Urinalysis Case: A Primer,* The Army Lawyer 7, 17 n. 110 (September 1988). These studies have shown that simply placing marijuana in boiling water will not release the chemicals necessary to create the metabolites of tetrahydrocannabinol (THC) in a person's urine. It is true that hashish or "hash oil" (which is produced by using a solvent on leaf marijuana) produces free THC. However, the concentrations of that chemical in those products is so strong (up to 60 percent purity) that chemists would surely know if a person had taken it. *See Report of an ARF/WHO Scientific Meeting on Adverse Health and Behavioral Consequences of Cannabis Use,* Addiction Research Foundation (1981). Thus, appellant's chances of prevailing on her primary defense, *i.e.,* that Capt Sztuka must have spiked her gumbo with marijuana, would seem to be remote.

73. Further, the key document in this case is the "transcript" of appellant's tape which the defense never introduced at trial. Thus, the normal inferences pertaining to non-disclosed evidence should apply. When a party fails to disclose evidence, one can assume that the evidence might be used against that party. *Cf. Arizona v. Youngblood,* 488 U.S. 51, 59–60, 109 S.Ct. 333, 338, 102 L.Ed.2d 281 (1988) (Stevens, J., concurring); *United States v. Manuel,* 43 MJ 282 (1995); *United States v. Kern,* 22 MJ 49, 52 (CMA 1986). As the court below found, "to say" that the tape "is subject to interpreta-

tion is to place it in" the light most favorable to appellant. ¶ 68. Since appellant did not produce the tape or a partial transcript of it until the post-trial hearing, the opposite is true. Based on my review of the findings by the judge and the court below, especially the events leading up to the search and the search itself, the transcript evidencing other misconduct, the lack of credibility of the witness promoting the "new" evidence, and the fact that chicken gumbo is normally not re-heated at 300° F, I do not believe a new trial would give a more favorable result. Accordingly, I would affirm the decision of the court below.